AMERICAN HONDA MOTOR CO., INC. *vs.* BERNARDI'S, INC.
(and a companion case[1]).

Suffolk. May 4, 2000. - September 1, 2000.

Present: MARSHALL, C.J., ABRAMS, GREANEY, IRELAND, SPINA, & COWIN, JJ.

*Consumer Protection Act,* Motor vehicle franchise. *Motor Vehicle,* Dealer, Franchise. *Statute,* Construction. *Practice, Civil,* Standing. *Words,* "Relevant market area."

Discussion of G. L. c. 93B, which regulates business practices in the automotive industry among motor vehicle manufacturers, distributors, and dealers. [427-428]

Discussion of the term "relevant market area" as found in G. L. c. 93B, § 4 (3) (*l*). [428-429]

This court concluded that the "relevant market area" of an automobile dealership, as that term appears in G. L. c. 93B, § 4 (3) (*l*), has a circular shape, with the boundary drawn around the smallest geographic area determined by statistical data and with the dealership in the center of the circular boundary. [430-433] COWIN, J., dissenting, with whom ABRAMS, J., joined.

This court declined to adopt or enunciate a particular methodology to compute and plat the statistical data that determine the circular geographic area constituting the relevant market area of an automobile dealership. [433-434]

This court concluded that G. L. c. 93B, § 4 (3) (*l*), is the sole provision under that statute for automobile dealers to challenge the establishment of a proposed new dealership. [434-436]

CERTIFICATION of questions of law to the Supreme Judicial Court by the United States Court of Appeals for the First Circuit.

*Richard B. McNamara* for Bernardi's, Inc., & another.

*Robert D. Cultice* (*Melissa A. Hoffer* with him) for American Honda Motor Co., Inc.

*John Whatley,* of the District of Columbia, *Charles H. Lockwood, II,* of Virginia, & *Daniel L. Goldberg, William N. Berkowitz,* & *Alicia L. Downey,* for Alliance of Automobile Manufacturers & another, amici curiae, submitted a brief.

IRELAND, J. In two separate actions commenced, and later consolidated, in the United States District Court for the District

[1]American Honda Motor Co., Inc. *vs.* Richard Lundgren Incorporated.

of Massachusetts, American Honda Motor Co., Inc. (Honda), a distributor of Honda motor vehicles, sought a declaration that Bernardi's, Inc. (Bernardi's), and Richard Lundgren Incorporated (Lundgren), both dealers authorized to sell and service Honda motor vehicles (dealers), lacked standing to protest the proposed establishment of a new Honda dealership[2] in Westborough because the new dealership's location was not within either dealer's "relevant market area" as defined in G. L. c. 93B, § 4 (3) (*l*), fifth par.[3] The dealers counterclaimed, alleging in count I of their counterclaims that the proposed new dealership fell within their respective market areas and was, thus, an arbitrary, unfair, and deceptive act or practice in violation of G. L. c. 93B, § 4 (3) (*l*), which should be enjoined. They also alleged, in count II of their counterclaims, that Honda's proposal to establish the Westborough dealership was an act of retaliation, in violation of G. L. c. 93B, § 4, against them for their involvement in other litigation against Honda.

A Federal District Court judge concluded that under G. L. c. 93B, § 4 (3) (*l*), fifth par., the "relevant market area" of a motor vehicle dealer "is a circle, with the dealer at the center, circumscribing the geographical area comprising either two-thirds of the dealer's new vehicle sales or two-thirds of its service sales, whichever is smaller." Based on this conclusion, the dealers stipulated that they lacked standing to protest the proposed new dealership, and the judge entered judgment in favor of Honda on its petitions for declaratory judgment, and entered judgment against the dealers on count I of their counterclaims. The judge also dismissed count II of the dealers' counterclaims with prejudice, having concluded that § 4 (3) (*l*) "is the sole provision within c. 93B under which an aggrieved dealer may seek relief from an alleged arbitrary prospective dealership placement." The dealers appealed from the judgment.

The United States Court of Appeals for the First Circuit, after determining that there was no controlling Massachusetts precedent pertinent to the issues of this case, certified, pursuant to S.J.C. Rule 1:03, as appearing in 382 Mass. 700 (1981), the following two questions to this court:

---

[2]Honda had previously notified the dealers, in compliance with G. L. c. 93B, § 4 (3) (*l*), of its intent to establish a new dealership in Westborough.

[3]General Laws c. 93, § 4 (3), inserted by St. 1970, c. 814, § 1, was revised in 1977, St. 1977, c. 717, § 3, and has remained unchanged. It is this 1977 version that is before us.

"1. How should the relevant market area of a motor vehicle dealer be defined under Mass. Gen. Laws Ann. ch. 93B, § 4(3)(*l*)?

"2. Is Mass. Gen. Laws Ann. ch. 93B, § 4(3)(*l*) the sole provision within chapter 93B under which a motor vehicle dealer may seek relief from a prospective additional dealership which will sell the same motor vehicles as sold by the established motor vehicle dealer?"

In its certification order, the Court of Appeals welcomed our "discussion of any relevant Massachusetts law." We conclude that a dealer's "relevant market area," as defined under G. L. c. 93B, § 4 (3) (*l*), fifth par., although not a perfect circle, is a geographic area circular in shape,[4] and contiguous to the existing dealer's location; and that § 4 (3) (*l*) is the sole provision within c. 93B under which a motor vehicle dealer may seek relief from a prospective additional dealership that will sell the same motor vehicles as sold by the existing motor vehicle dealer.

1. *Defining the relevant market area.* General Laws c. 93B, § 3 (*a*), declares unlawful specific "[u]nfair methods of competition and unfair or deceptive acts or practices" which occur in the automotive industry primarily among motor vehicle manufacturers, distributors, and dealers,[5] and which ultimately affect consumers. See *id.* at § 4; *Tober Foreign Motors, Inc.* v. *Reiter Oldsmobile, Inc.*, 376 Mass. 313, 319 (1978). Among the acts or practices proscribed, as far as relevant here, is the improper granting of "a franchise[6] or selling agreement to or

---

[4]A "circular" shape may differ from the shape of a perfect "circle." A "circle" is "a closed plane curve every point of which is equidistant from a fixed point within the curve." Webster's Third New Int'l Dictionary 408 (1993). The area within a circle can be measured by the distance of the circle's radius, which is "a line segment extending from the center of a circle or sphere to the curve or surface." *Id.* at 1874. A "circular" shape has "the exact or approximate form or outline of a circle: ROUND." *Id.* at 409.

[5]The terms "[m]anufacturer," "[d]istributor," and "[m]otor vehicle dealer" are defined in G. L. c. 93B, § 1 (*b*), (*g*), and (*h*). It is undisputed that both Bernardi's and Lundgren are "[m]otor vehicle dealer[s]" as defined in G. L. c. 93B, § 1 (*h*), and that Honda is a "[d]istributor" as defined in G. L. c. 93B, § 1 (*h*).

[6]The term "[f]ranchise" is defined in G. L. c. 93B, § 1 (*i*), as "an oral or written arrangement for a definite or indefinite period in which a manufacturer,

with an additional franchisee[7] who intends or would be required by such franchise or selling agreement to conduct its dealership operations from a place of business situated within the relevant market area of an existing franchisee or franchisees representing the same line make." G. L. c. 93B, § 4 (3) (*l*). Pursuant to the procedures set forth in § 4 (3) (*l*), an existing dealer may protest the addition of a new dealership as improper, but may only do so if the proposed new dealership is within its "relevant market area." The statute defines "relevant market area" as "the more narrowly defined and circumscribed geographical area immediately surrounding its existing dealer location within which it obtained, during the period of time the dealership business has been operated from said location or the three-year period immediately preceding the date of said notice of intent to grant or enter into an additional franchise or selling agreement, whichever is the lesser, at least two-thirds of (i) its retail sales of new motor vehicles of said line make or (ii) its retail service sales, regardless of whether its franchise or selling agreement delineates or establishes a specific area of responsibility or whether, by custom or usage, a specific area of responsibility has been established or another motor vehicle dealer with a franchise or selling agreement covering the same line makes has a place of business in such market area."

The wording of the 1977 revision of § 4 (3) (*l*) has been said to "perplex even the most percipient logician." *Ricky Smith Pontiac, Inc.* v. *Subaru of New England, Inc.*, 14 Mass. App. Ct. 396, 412 (1982). There the court examined, in particular, the definition of "relevant market area" as that term appeared in the 1977 statute, noting that its revised definition established a "bright line test" for determining a dealer's relevant market area. *Id.* at 414.[8] Under this test, "a judge analyzes hard statistical data [comprising two-thirds of the dealer's new vehicle

distributor or wholesaler grants to a motor vehicle dealer a license to use a trade name, service mark, or related characteristic, and in which there is a community of interest in the marketing of motor vehicles or services related thereto at wholesale, retail, leasing, or otherwise."

[7]The term "[f]ranchisee" is defined in G. L. c. 93B, § 1 (*k*), as "a motor vehicle dealer to whom a franchise is offered or granted."

[8]The court in *Ricky Smith Pontiac, Inc.* v. *Subaru of New England, Inc.*, 14 Mass. App. Ct. 396, 406-409 (1982), considered whether the trial judge properly determined the "relevant market area" as defined by the 1970 version of G. L. c. 93B, § 4 (3) (*l*), by looking to the amended definition of that term as appearing in St. 1977, c. 717, § 3. Contrary to the definition of

sales and two-thirds of its service sales] to draw two geographic areas and, after the areas are platted, he simply chooses the smaller of the two." *Id.* at 415. The statistical data are compiled from the lesser of the two following time periods: "during the period of time the dealership business has been operated from said location or the three-year period immediately preceding the date of said notice of intent to grant or enter into an additional franchise or selling agreement." G. L. c. 93B, § 4 (3) (*l*), fifth par. We generally agree with this approach, and note that the dealers' contentions with the District Court judge's conclusion do not concern the application of this test, but rather concern the confines, or shape, of the resulting smaller geographic area derived from the statistical data (the relevant market area), and the methodology used to establish the two geographic areas (and resulting relevant market area). As noted by the Court of Appeals, we have not yet had occasion to address these issues.

The statute defines the shape of a dealer's relevant market area as "the more narrowly defined and circumscribed geographical area immediately surrounding its existing dealer location." The dealers suggest that the plain meaning of this language requires a court to plat two irregular shaped areas, or polygons,[9] consisting of the dealer's new vehicle sales and service sales, and thereafter, choose the polygon which has the smaller circumscribed shape as a dealer's relevant market area. Pursuant to this approach, the shape of a dealer's relevant market area could be depicted as an oval, and would better reflect a dealer's actual market. The dealers assert that none of the definitions of the term "circumscribe" requires the circumscribed area to be in the shape of a perfect circle, and that the phrase "immediately surrounding" also does not require a perfect circle.

---

"relevant market area" in the 1977 statute, the 1970 statute provided that a dealer's "relevant market area" "be determined exclusively by equitable principles." *Id.* at 402. The court held that "it was proper for the trial judge to be guided by the definition in G. L. c. 93B, § 4 (3) (*l*) . . . in determining [the dealer's] relevant market area under the 1970 statute by 'equitable principles.' " *Id.* at 411. The court's reference that each dealer's relevant market area "would probably be irregular in shape," when read in context, is a characterization of the relevant market areas as constructed under the 1970 statute's "equitable principles" standard. *Id.* at 421 n.28.

[9] A "polygon" is defined as "a closed figure consisting of straight lines joined end to end," and a "polygonal" area is characterized as an area "having many sides." Webster's Third New Int'l Dictionary 1758 (1993).

When interpreting a statute, we are to construe the words therein "according to their natural import in common and approved usage." *Commonwealth* v. *Welosky,* 276 Mass. 398, 401 (1931), cert. denied, 284 U.S. 684 (1932). "While courts should look to dictionary definitions and accepted meanings in other legal contexts, . . . their interpretations must remain faithful to the purpose and construction of the statute as a whole" (citations omitted). *Heritage Jeep-Eagle, Inc.* v. *Chrysler Corp.,* 39 Mass. App. Ct. 254, 258 (1995). Consistent with these principles of statutory construction, we conclude that the Legislature intended the shape of a dealer's "relevant market area" to be a geographic area generally circular in shape, although not a perfect circle, and contiguous to the existing dealer's location.

We agree with the dealers that the term "circumscribe" does not necessarily require the drawing of a circle. The word "circumscribe" means "to be drawn around (as a geometrical figure) so as to touch at as many points as possible . . . a curve circumscribing a polygon . . . to draw (as a line) around something [such as] a circle around a triangle." Webster's Third New Int'l Dictionary 410 (1993). Depending on the object, geographic area, or geometric figure circumscribed, the shape of the circumscription may or may not constitute a circle. Accordingly, the word "circumscribed" as it appears in the statute cannot be read in isolation; it must be construed in the context of what is being circumscribed. Here, the object or "something" being circumscribed is the "geographical area immediately surrounding [the] existing dealer." It is this geographic area so defined from which the shape of the relevant market area is derived.

The plain meaning of the word "surround" establishes the relevant market area's shape. "Surround" means "to form a ring around: extend around or about the edge of: constitute a curving or *circular* boundary for: lie adjacent to all around or in most directions: *ENCIRCLE*" (emphasis supplied). Webster's Third New Int'l Dictionary 2302 (1993). We thus conclude that the shape of a dealer's relevant market area is circular.[10] The word "immediately," which is used to modify the word "surrounding," also has significance; its plain meaning instructs that the circular boundary be drawn around the smallest geographic area (as determined by statistical data) closest to the existing dealership, with the existing dealership in the center of the

---

[10]See note 4, *supra.*

circular boundary. See Webster's Third New Int'l Dictionary 1129 (1993) (defining the adjective "immediately" as "without intermediary: in direct connection or relation: CLOSELY . . . contiguous").

The dissent takes issue with the fact that our construction of the definition of a dealer's "relevant market area" does not result in a shape that constitutes a perfect circle. We note that while the District Court judge concluded that the terms "circumscribed" and "immediately surrounding" import a circle, he did not examine the plain meaning of those terms in his decision. Further, we agree with the dealers that, had the Legislature intended the relevant market area to comprise a perfect circle, it would have employed the term "radius," which it employed elsewhere in the statute,[11] or the term "circle," in the definition of "relevant market area."[12] The absence of these terms is telling, and can only be viewed as intentional. See *Doe v. Superintendent of Schools of Worcester*, 421 Mass. 117, 128 (1995). Last, while we recognize that, by amending the definition of "relevant market area," the Legislature intended a "bright line test" for determining a dealer's relevant market area, see *Ricky Smith Pontiac, Inc.* v. *Subaru of New England, Inc., supra* at 414, the dissent assumes, without explaining, that a perfect circle formulation of the "relevant market area" would be easier to apply than a circular formulation, and states that the court's circular formulation will "provoke unnecessary factual disputes." *Post* at 437. We disagree. A circular formulation is consistent with establishing a bright line test in that former "equitable" principles are removed from consideration when determining a dealer's "relevant market area," and the "relevant market area" is now limited to a particular shape. Additionally, factual disputes under a perfect circle formulation of the "relevant market area" would likely follow. For instance, the

---

[11]For example, G. L. c. 93B, § 4 (3) (*l*), third par., requires a manufacturer or distributor that plans to enter into an additional franchise agreement to give written notice of such "to each motor vehicle dealer with a franchise or selling agreement covering the same line make within a twenty mile *radius* of the location where the business of the proposed franchise will be located" (emphasis supplied). See G. L. c. 93B, § 4 (3) (*l*), second par.

[12]Many States with legislation concerning the establishment or relocation of a motor vehicle dealership define a dealer's relevant market area in terms of a geographic area within a certain mile radius of the existing dealership. See, e.g., Conn. Gen. Stat. Ann. § 42-133r(14) (West 1992); Del. Code Ann. tit. 6, § 4902(10) (1999); Minn. Stat. Ann. § 80E.14(1) (West 1999).

experts would most likely dispute the length of the perfect circle's radius, or whether the radius follows existing topography. Unless the definition of "relevant market area" is amended, factual disputes and further litigation are seemingly likely under any formulation of "relevant market area."

We recognize that our interpretation of the shape and location of a dealer's "relevant market area" may preclude a sizable portion of a dealer's actual market from being contained within its "relevant market area." This result apparently was considered by the Legislature, and is fully consistent with the statute. By its terms the statute provides a definition for a dealer's "relevant market area," and that definition controls "regardless of whether . . . by custom or usage, a specific area of responsibility has been established [by the existing dealer]." G. L. c. 93B, § 4 (3) (*l*), fifth par. See *Tober Foreign Motors, Inc.* v. *Reiter Oldsmobile, Inc.*, 376 Mass. 313, 331-332 (1978) ("The 1977 revision sets out a quite sharp definition [of relevant market area] which may somewhat sacrifice theoretical correctness to ease of practical application"). To interpret the statute's definition of "relevant market area" as do the dealers, would improperly ignore this language. See *International Org. of Masters, Mates & Pilots* v. *Woods Hole, Martha's Vineyard & Nantucket S.S. Auth.*, 392 Mass. 811, 813 (1984) ("Wherever possible, we give meaning to each word in the legislation; no word in a statute should be considered superfluous").

Our interpretation of a dealer's "relevant market area" is consistent with the purpose of c. 93B. There is no question that "c. 93B was enacted in recognition of the potentially oppressive power of automobile manufacturers and distributors in relation to their affiliated dealers." *Beard Motors, Inc.* v. *Toyota Motor Distribs., Inc.*, 395 Mass. 428, 432 (1985). "Section 4 (3) (*l*) is one of a set of provisions evidently directed to the time-honored State purpose of preserving a sound competitive market free of the domination of oligopolists at the top of a vertical chain of manufacture, distribution, and sale." *Tober Foreign Motors, Inc.* v. *Reiter Oldsmobile, Inc.*, supra at 322-323. See *Heritage Jeep-Eagle, Inc.* v. *Chrysler Corp.*, supra at 259, quoting ABA Antitrust Section: Monograph No. 17, Franchise Protection: Laws Against Termination and the Establishment of Additional Franchises at 90 (1990) (intent of G. L. c. 93B, § 4 [3] [*l*], is "to protect the franchisees from destructive intrabrand competition and the unequal economic

power of manufacturers"). What cannot be lost when examining the statute's purpose, however, is the fact that, in addition to governing "the relations among manufacturers, distributors, and dealers," c. 93B also applies to certain "transactions between dealers and the public," and thus, also serves to protect the public. *Tober Foreign Motors, Inc.* v. *Reiter Oldsmobile, Inc.,* *supra* at 319. See G. L. c. 93B, §§ 4 (1), (4). "While the public and existing dealers share common interests in making sure that the existing dealers are not put out of business by unfair competition and that a stable group of dealers is able to provide sales and service on a continuing basis, the existing dealers' interests and the public's interests are frequently at odds. Public interest will favor increased competition in most circumstances, where the existing dealers' interests may be opposite." ABA Antitrust Section: Monograph No. 17, Franchise Protection: Laws Against Termination and the Establishment of Additional Franchises, *supra* at 91. General Laws c. 93B, § 4 (3) (*l*), strikes a balance between those competing interests by affording existing dealers some protection from competition (within a dealer's "relevant market area" if the proposed new dealership is found to be "arbitrary" under G. L. c. 93B, § 4 [3] [*l*]), and by likely yielding choices for consumers (such as where to purchase or service a vehicle, or what price to pay for a new vehicle or for servicing a vehicle), as a result of not shielding dealers from all competition.

In challenging the District Court judge's conclusion concerning the shape of a dealer's relevant market area, the dealers advance a method to plat the statistical data used to determine the two-thirds of new vehicle sales and service sales. Specifically, they assert that "the proper method . . . is to list, in descending order of frequency, the towns or zip codes in which the [existing] dealer sells or services the most new cars [within the applicable statutory time frame] until two-thirds of those sales or service transactions are reached. . . . If the zip code including the proposed dealership is on this list, the dealer has standing; if not, the dealer does not." The dealers concede that this methodology "creates an irregularly shaped [relevant market area] that accurately reflects the towns into which the dealers make the most retail sales or service sales."

While we note that the methodology advanced by the dealers does not comport with our interpretation of the definition of a dealer's "relevant market area," we decline to enunciate a

particular methodology at this time to compute and plat the statistical data. As illustrated by the parties' experts, several methods may be employed. Significantly, the statute does not indicate *how* two-thirds of new vehicle sales or service sales should be computed and platted. We conclude that, depending on the methodology employed, the method of computing and platting two-thirds of a dealer's new vehicle sales or service sales is one more appropriately left for expert testimony. We emphasize, however, that the methodology must comport with our interpretation of the definition of "relevant market area."

2. *Dealer's avenue to challenge the establishment of a prospective new dealership.* We next consider whether G. L. c. 93B, § 4 (3) (*l*), is the sole provision within c. 93B under which a dealer may seek relief from the establishment of a prospective new dealership that will sell vehicles of the same line make as the existing dealer. Subsumed within this question, on review of the record, is whether a dealer may maintain an action under G. L. c. 93B, § 4 (1), to challenge a distributor's decision to establish a new dealership as retaliatory against the dealers.[13] We conclude that § 4 (3) (*l*) is the sole provision available to dealers under c. 93B to challenge the establishment of a proposed new dealership.

Section 3 (*a*) of G. L. c. 93B declares "[u]nfair methods of competition and unfair or deceptive acts or practices, as defined in section four," unlawful. Section 4 specifies, in subsections 2 through 4, particular "acts or practices" that shall be "deemed" violations of § 3 (*a*). Among those deemed violations is, in § 4 (3) (*l*), first par., the improper grant of a new dealership "within the relevant market area of an existing [dealer]." The grant of a new dealership is improper if done "arbitrarily and without notice to existing [dealers]." *Id.* The statute establishes a specific procedure whereby a manufacturer, or distributor, must notify certain existing dealers of its intent to establish a new dealership, see § 4 (3) (*l*), third par.,[14] and whereby an existing dealer may challenge a prospective new dealership, see § 4 (3) (*l*),

---

[13]In this case, the dealers alleged that Honda proposed the new dealership to retaliate against them for their involvement in other litigation against Honda.

[14]Section 4 (3) (*l*), third par., requires a manufacturer to notify, in writing, dealers within a twenty-mile radius of the proposed dealership location of its intention to establish a new dealership. This notice must be given "at least sixty days" prior to the granting of the dealership. *Id.*

fourth par. A dealer must notify a manufacturer in writing "within thirty days from the date on which it received [the manufacturer's notice of its intent to establish a new dealership]" of the dealer's intention to protest the proposed new dealership. *Id.* "Prior to the date set forth in [the manufacturer's] notice on or after which such franchise or selling agreement will be granted or entered into," a dealer "may . . . petition the superior court to determine whether such appointment or proposed appointment is arbitrary." *Id.* "Such petition shall be entitled to a speedy trial." *Id.* As previously explained, the existing dealer must demonstrate that the proposed new dealership will fall within its "relevant market area" to protest its establishment. *Id.*

In contrast § 4 (1) does not proscribe a particular act or practice, but rather is more general in scope. Section 4 (1) provides: "It shall be deemed a violation of paragraph (*a*) of section three for any manufacturer [or] distributor . . . to engage in any action which is arbitrary, in bad faith, or unconscionable and which causes damage to any of said parties [including dealers] or to the public." To permit a dealer to challenge a proposed new dealership under this general provision would undermine and essentially nullify the statute, and more particularly, its standing requirement (§ 4 [3] [*l*], fourth par.), and specific procedures (§ 4 [3] [*l*], third & fourth pars.), which are aimed at providing an expedient mechanism for manufacturers, distributors, and dealers "to test, before capital is expended or damage done, the question whether a proposed new dealership unfairly poaches on an existing dealer's territory." *Richard Lundgren, Inc.* v. *American Honda Motor Co.*, 45 Mass. App. Ct. 410, 415 (1998). We are bound to "construe the statute to avoid any part of the legislation being meaningless or duplicative." *Id.*

Our conclusion is not inconsistent with the following language in *Tober Foreign Motors, Inc.* v. *Reiter Oldsmobile, Inc.*, 376 Mass. 313, 320 (1978), to which the dealers cite, and which the dealers state describes retaliation: "Yet another technique with potentialities of unfairness is the granting of new franchises near established ones: having invested in his dealership, *a dealer who has displeased the manufacturer*, or who simply appears to be dispensable, *finds his business turned into a losing venture overnight by the award of a new franchise around the corner*, and, it may be, without any practical benefit

to, or, indeed, with negative effects on, the buying public" (emphasis supplied). This language must be construed in context with the sentence following it, which, significantly, specifically references § 4 (3) (*l*), not § 4 (1). A dealer aggrieved by alleged retaliatory conduct of a manufacturer or distributor in connection with the manufacturer's or distributor's proposal to establish a new dealership, is not left without a remedy under c. 93B. The dealer may challenge this conduct as "arbitrary" under § 4 (3) (*l*). While the statute enumerates eight circumstances to consider when assessing whether the proposed new dealership is "arbitrary," the court is not limited to examining only those eight circumstances, but is required to "consider all pertinent circumstances," which may include whether the decision to establish a new dealership constituted an act of retaliation. See *Reiter Oldsmobile, Inc.* v. *General Motors Corp.*, 378 Mass. 707, 710 (1979) ("Whatever unfairness there may be in the grant of a competitive franchise derives solely from the statutory declaration in c. 93B, §§ 3 [*a*], 4 [3] [*l*]").

Last, the fact that § 4 (3) (*l*) happens to have a standing requirement does not, contrary to the dealers' assertions, condone "deliberate retaliatory conduct" by a manufacturer (or distributor), or result in a "loophole." Rather, the standing requirement reflects a legislative determination that only dealers of the same line and make, and in certain proximity to the prospective new dealership (based on a dealer's "relevant market area"), may challenge and potentially prevent new competition. Chapter 93B was not intended to provide all dealers with a statutory right to seek protection from potential competition.

The Reporter of Decisions is to furnish attested copies of this opinion to the clerk of this court. The clerk in turn will transmit one copy, under the seal of this court, to the Clerk of the United States Court of Appeals for the First Circuit, as answers to the questions certified, and will also transmit a copy to each party.

COWIN, J. (dissenting, with whom Abrams, J., joins). I respectfully dissent and would adopt the well-reasoned opinion of the United States District Court that concludes that the "relevant market area" is a circle, with the dealer at the center, which circumscribes the geographical area comprising either two-thirds of the dealer's new vehicle sales or two-thirds of the dealer's service sales, whichever is smaller.

It is unquestioned that the purpose of the Legislature in amending G. L. c. 93B, § 4 (3) (*l*), was to create a bright-line test. See *Tober Foreign Motors, Inc.* v. *Reiter Oldsmobile, Inc.*, 376 Mass. 313, 331-332 (1978) ("The 1977 revision sets out a quite sharp definition which may somewhat sacrifice theoretical correctness to ease of practical application"); *Ricky Smith Pontiac, Inc.* v. *Subaru of New England, Inc.*, 14 Mass. App. Ct. 396, 414 (1982) ("the formula definition [under the 1977 revision] creates a bright-line test that substantively changes the equitable principles standard in the 1970 statute"). The court has adopted the basic approach of the United States District Court but has added a wrinkle that is inconsistent with the bright-line test and one that will provoke unnecessary factual disputes. The court's definition will, in my view, only serve to afford interested parties an opportunity to engage in further litigation. This is inconsistent with the legislative intent and with our prior cases on this subject.

Prior to the 1977 revision of the statute, the court was required to determine relevant market area by resort to "equitable principles." At that time, "a judge, confronted with a case like this, would likely consider a multiplicity of factors including conditions in the industry, pertinent anti-trust principles, the statute's purposes, the circumstances of the parties and the terms of their contract, to evolve, by way of a rule of fairness, the objecting dealer's relevant market area." *Ricky Smith Pontiac, Inc.*, *supra* at 414-415. This court has characterized the process by referring to "the numerous (and sometimes amorphous) circumstances involved in determining an automobile dealership's relevant market area 'exclusively by equitable principles.' " *Id.* at 411 n.17. Clearly, the Legislature chose to move away from this by adopting a simpler test which is objectively applicable, eschewing the earlier more subjective employment of "equitable principles." The court's opinion today moves back in a direction of uncertainty abandoned by the Legislature twenty-three years ago.