**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────────

**No. 04-1137**

─────────────

In Re: AMERICAN HONDA DEALERSHIP RELATIONS
LITIGATION

------------------------------------------------

RICHARD LUNDGREN, INCORPORATED, d/b/a Lundgren
Honda, a Massachusetts Corporation; BERNARDI'S
INCORPORATED, d/b/a Bernardi Honda, a
Massachusetts Corporation,

                                  Plaintiffs - Appellants,

     versus

AMERICAN HONDA MOTOR COMPANY, INCORPORATED, a
California Corporation,

                                  Defendant - Appellee.

─────────────

Appeal from the United States District Court for the District of
Maryland, at Baltimore. J. Frederick Motz, District Judge. (CA-
95-1069-MDL; CA-95-3313-JFM; CA-95-3314-JFM)

─────────────

Argued: November 30, 2004        Decided: March 17, 2005

─────────────

Before TRAXLER, GREGORY, and DUNCAN, Circuit Judges.

─────────────

Affirmed by unpublished per curiam opinion.

─────────────

**ARGUED:** James Patrick Ulwick, KRAMON & GRAHAM, Baltimore, Maryland,
for Appellants. Robert A. Van Nest, KEKER & VAN NEST, San
Francisco, California, for Appellee. **ON BRIEF:** David B. Irwin,

IRWIN, GREEN & DEXTER, L.L.P., Towson, Maryland; Stacey L. Wexler, KEKER & VAN NEST, San Francisco, California, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

PER CURIAM:

The dispute at issue in this appeal arose from multi-district litigation ("MDL") involving current and former Honda dealers who sought redress against American Honda Motor Company, Inc. ("American Honda"), among other defendants, for fraudulent sales and distribution schemes. See generally In re American Honda Motor Co. Dealerships Relations Litig., 941 F. Supp. 528, 534-35 (D. Md. 1996). On October 9, 1998, the district court for the District of Maryland entered an "Order of Final Settlement Approval and Judgment of Dismissal of Settled Claims" (the "Settlement Agreement") in connection with the MDL. See In re American Honda Motor Co. Dealerships Relations Litig., 315 F.3d 417, 432 (4th Cir. 2003). Plaintiffs Richard Lundgren, Inc. and Bernardi's, Inc., both Honda dealers and parties to the MDL, contend that American Honda's decision to open a Honda dealership in Westborough, Massachusetts, near their dealerships, violates the Settlement Agreement, which expressly prohibits American Honda from retaliating against any Honda dealer because of that dealer's participation in the MDL. The district court denied plaintiffs' motion for a finding of retaliation. We affirm, concluding that the district court's factual findings were not clearly erroneous.

In 1994, Lundgren brought an action in Massachusetts state court to prevent American Honda from awarding a dealership in Westborough, Massachusetts, which is located in the same vicinity as Lundgren's dealership.  The state court enjoined the opening of the dealership, concluding that "the intended creation of a new dealership in Westborough was not based on any careful consideration of relevant market data at the time, and was hence arbitrary."  Richard Lundgren, Inc. v. American Honda Motor Co., No. 921091, 1994 WL 879478, at *5 (Mass. Superior Ct. Sept. 1994).

In May 1995, William Green became the manager of American Honda's Market Planning Department ("Marketing"), which is charged with "ensur[ing] that Honda is properly represented in automobile markets by having a sufficient number of dealers, dealers that are properly located, and facilities that are competitive." J.A. 1677. Green testified that when he took this position, Marketing's 1995 agenda already included plans to evaluate several specific markets that were potentially suitable for new dealerships.  One of the pending market studies was the "Worcester Multiple Point Market Study," which covered the Westborough area.  J.A. 1109.  Green indicated that, in his capacity as department manager, he had the authority to discontinue the Worcester Study or any other market study included on the agenda.  In June 1995, however, after reviewing sales data related to the Worcester market, Green

concluded that it was a "viable study" and that it should move forward.

Marketing completed the Worcester Study in the fall of 1995, finding that the "Worcester Metro market was severely underperforming." J.A. 1103. The basis for this conclusion was threefold. First, the data suggested that "Honda's market penetration lagged significantly behind the expected performance levels" as compared to an adjacent Boston-area market and Honda's national performance. J.A. 1103-04. American Honda's market penetration of the Worcester market was only 73% of its national market penetration level and only 57.91% of that achieved in the adjacent local market of North Boston. Second, the data suggested that "Toyota dominated the Worcester Metro market to a far greater degree than it dominates Honda on a national or zone level" in terms of market share, percentage of retail registrations, total industry registrations, total competitive segment registrations, and retail competitive segment registrations. J.A. 1104. Finally, the data gathered by Marketing reflected that American Honda suffered substantial lost sales opportunities--calculated by determining the number of Honda registrations in the Worcester market attributed to Honda dealers operating <u>outside</u> of the Worcester market and adding it to the deficit existing between the market penetration of the Worcester market and the North Boston market.

5

Based on the market data yielded by the Worcester Study, Marketing recommended that improvements be made both to Lundgren's dealership and that of The Honda Store, a dealership in the Worcester market that did not join the MDL. Marketing also recommended that American Honda create an "open point," i.e., establish a location for a new dealership, in Westborough. The market study considered other locations within the Worcester market but concluded that Westborough presented the best location based on a number of factors, including passenger vehicle registration data, population estimates for 1995 and 2000, and the projected household income in Westborough for 1995 and 2000. The Worcester Study also included an analysis of the extent to which the creation of a new dealership in Westborough would affect existing Honda dealerships, but found it "unlikely" that there would be "any net impact on the existing . . . dealerships." J.A. 1106. In January 1996, American Honda presented the details of the Worcester Study, including the recommendation for a new dealership, to the existing Honda dealers operating within the Worcester market.

In early 1998, American Honda issued a Letter of Intent ("LOI") to Mark Ragsdale and Robert Avolizi, awarding them the new dealership in Westborough. In March 1998, pursuant to a Massachusetts statutory requirement, American Honda formally notified area Honda dealers of the new Westborough location. Plaintiffs protested under the Massachussetts statutory scheme

6

governing manufacturer-dealer relations. <u>See</u> Mass. Gen Laws ch. 93B, § 4(3)(1).

In April 1998, American Honda brought a declaratory judgment action in the United States District Court for the District of Massachusetts, seeking a preemptive ruling that neither Lundgren nor Bernardi's had standing to protest under § 4(3)(1) because neither dealership was located within the "relevant market" of the proposed dealership. Plaintiffs asserted counterclaims, arguing in part that American Honda's addition of the new dealership was retaliatory conduct that violated the general provisions of § 4 of the Massachusetts statute. The federal court in Massachusetts concluded that plaintiffs lacked standing to protest the opening of the new dealership under § 4 of the statute because they did not operate within the "relevant market area" under § 4(3)(1). <u>See</u> <u>American Honda Motor Co. v. Bernardi's, Inc.</u>, 113 F. Supp. 2d 58, 59, 62 & n.6 (D. Mass. 1999). The First Circuit Court of Appeals then certified the "relevant market" issue to the Supreme Judicial Court of Massachusetts. <u>See</u> <u>American Honda Motor Co. v. Bernardi's, Inc.</u>, 198 F.3d 293, 294-96 (1st Cir. 1999).

In November 1999, as the parties awaited a decision from the First Circuit, plaintiffs proceeded to the District of Maryland, which retained jurisdiction over issues relating to the MDL and the Settlement Agreement, and filed a motion seeking a finding that American Honda's decision to open the Westborough dealership

7

constituted retaliation for their participation in the MDL, in violation of the Settlement Agreement. American Honda based its opposition largely on the theory that plaintiffs' motion could "derail or seriously delay ongoing litigation in . . . the District of Massachusetts," and would create "duplicative proceedings" in the District of Maryland. J.A. 484. The district court for the District of Maryland declined to make any findings on retaliation and concluded that the litigation in Massachusetts should proceed. Subsequently, the Supreme Judicial Court of Massachusetts rejected the interpretation of "relevant market" adopted by the District of Massachusetts, see American Honda Motor Co. v. Bernardi's, Inc., 735 N.E.2d 348, 350 (Mass. 2000), and the First Circuit then remanded for reconsideration in light of the guidance provided by the state court. See American Honda Motor Co. v. Bernardi's, Inc., 235 F.3d 1 (1st Cir. 2000). Ultimately, the result was the same because the federal district court in Massachusetts concluded that, even under the new interpretation of "relevant market area," plaintiffs lacked standing to protest. See American Honda Motor Co. v. Bernardi's, Inc., 188 F. Supp. 2d 27 (D. Mass. 2002), aff'd, 314 F.3d 17 (1st Cir. 2002).

## II.

In March 2003, plaintiffs renewed their motion in the District of Maryland for a finding that American Honda's decision to open

8

the Westborough dealership was retaliatory, in violation of Paragraph 3.1(b) of the Settlement Agreement, which states that:

> While expressly contesting the veracity of any Claim for Retaliation, the Honda Defendants represent that they shall not engage in any retaliatory or discriminatory conduct against a Settling Class Member as a result of a dealer's participation in litigation against the Honda Defendants or status as a Settling Class Member.

J.A. 102-03. Paragraph 1 of the Settlement Agreement defines "Claim of Retaliation" as "any claim, allegation or assertion of a Settling Class Member . . . assert[ing] that the Honda Defendants have engaged in wrongful conduct directed at the Settling Class Member because of that member's status as a litigating dealership." J.A. 98.

The district court applied a burden-shifting analysis similar to the McDonnell-Douglas framework used in Title VII cases, see Price v. Thompson, 380 F.3d 209, 212 (4th Cir. 2004), and the parties have not questioned this approach to the applicable burdens of proof, either below or on appeal. Under this scheme, the plaintiff must establish a prima facie case of retaliation by showing that he "engaged in protected activity, that [the defendant] took adverse action against him, and that a causal relationship existed." Id. The burden then shifts to the defendant, who must "establish a legitimate non-retaliatory reason" for its actions. Id. Finally, the plaintiff bears the burden of showing the "proffered reasons are pretextual." Id. Within this

9

analytical framework, the district court made its factual findings, which we now review for clear error.

A.

The district court concluded that plaintiffs established a prima facie case of retaliation, and American Honda does not challenge this conclusion. Briefly summarized, plaintiffs' evidence of retaliation focused on three arguments. First, plaintiffs claimed that American Honda's decision to add a dealership in Westborough was inconsistent with its nationwide freeze on new dealerships during that time. Plaintiffs presented evidence that, between August 1995 and July 1998, American Honda issued only seven LOIs to proposed dealers nationwide, and only one of those dealers actually began doing business. Moreover, two of these LOIs covered the Westborough and Norwood areas, both of which are in close proximity to plaintiffs, while all of the other LOIs involved open points in different states, with no two proposed locations in the same state. Second, plaintiffs argued that American Honda was particularly displeased with them in light of their considerable litigation history with American Honda. Third, plaintiffs asserted that the market data compiled in the 1996 Worcester Study and used to support the opening of a new Westborough dealership was stale by the time American Honda formally notified plaintiffs of the new dealership. Plaintiffs

10

argued that because American Honda did not do another study of market conditions in 1998, it had no factual support for its position that the market required another dealership.

In response, American Honda offered its legitimate, nonretaliatory business justification for opening the Westborough dealership -- the Worcester market was underperforming. In support of its position, American Honda submitted the Worcester Study. Additionally, American Honda presented evidence that Marketing continued to evaluate data for the Worcester market on an on-going basis after the formal market study was completed in 1996. Based on the same factors included in the formal Worcester Study, Green concluded that the Honda dealerships continued to underperform in the Worcester market each year, up to and including the end of 2002 when this matter was submitted to the district court. American Honda also offered Green's affidavit to rebut plaintiffs' claim that, in 1998 when it officially announced plans for the Westborough dealership, American Honda had essentially put a hold on the opening of new dealerships elsewhere in the country. According to Green's unrefuted affidavit, beginning in 1995, Marketing conducted "approximately 62 detailed market studies," half of which resulted in a recommendation that American Honda create an open point. J.A. 1107. As of early 2003, new Honda dealerships had been opened in twelve of these markets.

Based on these submissions, the district court concluded that American Honda established a satisfactory nonretaliatory reason for opening the Westborough dealership. Thus, the district court indicated that, in order to succeed, plaintiffs would "have to prove that . . . [the Worcester Study was] pretextual" by attacking the reliability of the report or providing convincing "evidence of subjective retaliatory intent." J.A. 1327. Cf. Price, 380 F.3d at 212 ("[T]he plaintiff can prove pretext by showing that the explanation is unworthy of credence or by offering other forms of circumstantial evidence sufficiently probative of retaliation." (alteration and internal quotation marks omitted)).

B.

In attempting to show pretext, plaintiffs emphasized that neither Green, who headed Marketing when the market study was conducted and was deposed as American Honda's corporate designee under Rule 30(b), nor other executives, such a Vice-President Richard Colliver, were able to explain how or by whom the Worcester Study was placed on the 1995 agenda. Because American Honda was not able to provide a definitive explanation, plaintiffs argued that the only reasonable inference, in light of the timing of the study and the troubled relationship that existed between the parties, was "that Honda's decision to do so was motivated by retaliation." Brief of Appellants at 39.

12

The district court disagreed, however, noting that the Worcester Study was placed on the agenda before Lundgren and Bernardi's became MDL plaintiffs and that any retaliation for the pre-MDL litigation was "beyond [the court's] jurisdiction."  J.A. 1977.  Green's decision that the Worcester Study should proceed also occurred prior to plaintiffs joining the MDL.  And, plaintiffs fail to highlight any record evidence contradicting Green's testimony that he was unaware of plaintiffs' MDL status until after the Worcester Study was completed.  We cannot conclude that the district court's failure to find pretext based on this evidence was clearly erroneous.

C.

Plaintiffs' next major pretext argument attacks the Worcester Study as flawed because it used an unfair comparative market--the affluent, import-receptive North Boston market--as its benchmark for assessing market penetration.  The North Boston market, plaintiffs argue, was created by dividing the Boston metro market at a line where Honda's market penetration began to decrease. Relying on an affidavit from Dr. Ernest Manuel, the dealers' expert economic witness in prior Honda litigation, plaintiffs contend that the creation of the North Boston market was unprecedented and designed to ensure that the Worcester market compared poorly.  Dr. Manuel indicated that he reviewed market studies produced by

13

American Honda and found that only two -- the Boston market study (at issue in American Honda Motor Co. v. Clair International, Inc.) and the Worcester Study -- used but a portion of a metro market as a benchmark. Green, who also testified in the Clair litigation, indicated that American Honda used a split metro market for purposes of studying market penetration for Miami/Ft. Lauderdale, San Francisco, and Los Angeles. American Honda also presented the affidavit of Jim Anderson, its expert witness in economics, who explained that splitting a large metropolitan market for purposes of comparison is not uncommon among automobile manufacturers when there is inadequate representation in a sizable area within the metro market. In Anderson's opinion, using the North Boston market as a benchmark for Worcester was appropriate because North Boston was adjacent to but independent from the Worcester market, it was substantial in size, and it appeared to have adequate representation.

The district court found that the choice of the North Boston market as a benchmark for a market penetration comparison did not show pretext. Indeed, plaintiffs presented no expert testimony or other evidence demonstrating that the selection of a portion of a large metro market as a benchmark is inappropriate or unheard of in the industry, or otherwise contradicting Anderson's statements. We see nothing in the record, moreover, showing that American Honda failed to follow its standard method of analyzing market

14

performance. We conclude that the finding of the district court was not clearly erroneous.

## D.

Plaintiffs contend that pretext was also evident through American Honda's reliance on outdated data from a 1996 market study to justify the addition of another dealership in 1998. Specifically, plaintiffs assert that by 1998, American Honda was experiencing product shortages and was unable to adequately supply dealers like Lundgren, who had trouble meeting customer demand around this time. Plaintiffs also mention a number of other factors affecting the market that the Worcester Study failed to take into account, such as the advent of the Internet.

Clearly, the 1996 Worcester Study could not fully account for future events or predict the market in 1998, but that does not make the study itself flawed. Plaintiffs have not presented any evidence showing that the shortages skewed their market performance numbers in comparison to dealers in the North Boston market, the New England zone, or even the national market. Actually, American Honda presented evidence that the Worcester market continued to perform below national and local standards. Green began reviewing the data for the Worcester market following the completion of the Worcester study in 1996, and he continued to do so on at least an annual basis. We cannot say that the district court clearly erred

by refusing to find American Honda's use of the market study pretextual because of subsequently changing market conditions.

E.

Finally, plaintiffs allege that American Honda is paying a "subsidy" to Ragsdale, the selected candidate who holds an LOI awarding him the Westborough dealership, which plaintiffs argue is evidence of retaliatory intent.  American Honda selected Ragsdale in 1998, five years before the district court entered its order in this case.  In the meantime, Ragsdale was incurring financing costs associated with the land he acquired for the new dealership at a cost of approximately $2.2 million.  In March 2001, American Honda agreed to pay Ragsdale $500 per day to defray these costs and, ultimately, agreed to continue such payments until the litigation reached a conclusion.

Apparently, this precise arrangement was unique -- American Honda did not identify any other dealer candidate with whom it had a comparable arrangement.  However, Green testified that it was not unprecedented for American Honda to "assist" a proposed dealer financially by purchasing and holding the land during the course of a protest by a competitive dealer.  Green also indicated that the property was ideal and American Honda did not want to lose it as the legal wrangling continued.

16

The district court found that the arrangement was "not so incredibly unusual [as] to show pretext. . . . This has been litigated for a long time. . . . [Honda] wanted to hold onto [the] property . . . [and] the deal with Ragsdale in the event it prevailed." J.A. 1978. We cannot conclude that this finding was clearly erroneous.

III.

Finally, Lundgren and Bernardi's argue that the district court abused its discretion in refusing to afford them an evidentiary hearing via live or videotaped testimony to determine whether to grant injunctive relief. Plaintiffs claim the issue of retaliatory intent ultimately required the district court to assess the credibility of American Honda's witnesses and that it was error for the district court to rule only on the basis of affidavits, deposition transcripts, and documentary evidence.

Plaintiffs, however, never requested an evidentiary hearing or objected to the absence of one. On the contrary, the record suggests that all of the parties acquiesced to the resolution of plaintiffs' motion on the basis of their written submissions instead of live testimony. Although plaintiffs indicated that they would be "willing" to participate in an evidentiary hearing, they took the position that "the Court is more than justified in ruling in plaintiffs' favor on the current record." J.A. 1814. Because

17

the record belies any suggestion that the district court was presented with a demand for an evidentiary hearing, Lundgren and Bernardi's cannot now complain that the district court rendered its decision on the basis of written submissions.

Moreover, even if plaintiffs made an adequate request for an evidentiary hearing, we cannot agree that the district court abused its discretion in ruling in the absence of one. Plaintiffs have not specifically explained how an evidentiary hearing would have affected the basis of the district court's decision or the primary issues on appeal. Plaintiffs have not introduced evidence contradicting the key points established by American Honda's expert witness, nor have they identified any specific testimony by American Honda's decision-makers regarding Westborough that they believe to be false. The district court afforded plaintiffs 60 days of discovery on the issue of pretext, even though plaintiffs had access to the market report as early as 1998. Following the close of discovery, the district court conducted a hearing at which plaintiffs presented additional evidence on the issue of pretext. Plaintiffs have had ample opportunity to thoroughly anticipate these issues which could have been identified long before the merits hearing.

IV.

For the foregoing reasons, we affirm the district court's ruling.

<u>AFFIRMED</u>