The COADY CORP. d/b/a
495 Toyota, Plaintiff

v.

**TOYOTA MOTOR DISTRIBUTORS,**
**INC. Defendant.**

No. CIV.A.97–40219–NMG.

United States District Court,
D. Massachusetts.

April 14, 2003.

Christopher N. Cook, Comm of MA, Exec Office of Health & Human, Lawrence, for Coady Corp, Plaintiff.

Daniel L. Goldberg, Bingham McCutchen LLP, Boston, MA, for Toyota Motor Distributors, Inc., Defendant.

Evan T. Lawson, Lawson & Weitzen, LLP, Boston, MA, for Coady Corp, Plaintiff.

Michael Williams, Lawson & Weitzen, LLP, Boston, MA, for Coady Corp, Plaintiff.

David Yamin, Bingham McCutchen LLP, Boston, MA, for Toyota Motor Distributors, Inc., Defendant.

## MEMORANDUM OF DECISION

GORTON, District Judge.

On November 10, 1997 The Coady Corp. d/b/a 495 Toyota ("Coady"), filed a six-count complaint against Toyota Motor Distributors, Inc. ("Toyota") alleging (1) illegal restraint of trade in violation of the Sherman Act, 15 U.S.C. § 1 *et seq.*, (2) violation of the Automobile Dealers' Day in Court Act ("ADDCA"), 15 U.S.C. § 1221 *et seq.*, (3) unfair and deceptive trade practices in violation of the Massachusetts Consumer Protection Act, M.G.L. c. 93A, § 11, (4) sundry violations of the so-called "Dealer's Bill of Rights," M.G.L. c. 93B, and common law claims of (5) defamation and (6) breach of contract. This Court dismissed Coady's Sherman Act and Massachusetts Consumer Protection Act claims on April 29, 1998. By leave of the magistrate judge, Coady amended its complaint on May 26, 1999 expanding slightly its Chapter 93B claim. On September 20, 2002 this Court summarily denied the parties' cross motions for summary judgment.

The case was tried jury-waived commencing on January 13, 2003. After eight trial days of testimony, this Court took the matter under advisement and now, upon thorough consideration of all of the evidence presented, finds for Toyota on all counts.

## I. *Findings of Fact*

Coady, a Massachusetts corporation doing business as "495 Toyota," is a motor vehicle dealership located in Milford, Massachusetts and sells Toyota motor vehicles. Coady is owned by Kevin Coady who, for clarity, will be referred to by his full name throughout this Memorandum and Order. Toyota, a California corporation with its principal place of business in Torrance, California and a regional office in Mansfield, Massachusetts, is a regional representative of Toyota Motor Sales USA, Inc. and distributes Toyota motor vehicles and parts throughout "the Boston Region" which actually encompasses all of eastern New England ("the Region").

The Region consists of 71 dealers located throughout Maine, Vermont, New Hampshire, Massachusetts and Rhode Island. Toyota also sells and leases vehicles from its office in Mansfield to associates and their families and to Toyota Vendors. The Region is divided into districts. Before 1999 there were five districts with Coady being located in District 3 (roughly, central Massachusetts). In 1999 the Region was reorganized into seven districts and Coady was moved into District 4 (smaller but still primarily central Massachusetts). The other principal players in the case, Bernardi Toyota ("Bernardi") and Boch Toyota ("Boch"), were, at that time, reassigned from District 1 (the greater Boston metropolitan district with the highest volume market in the Region) to District 2 (a larger but still primarily metropolitan district). Coady's nearest competitor is Bernardi.

### A. Toyota Dealer Agreements

Coady has sold Toyota vehicles pursuant to a standard Toyota Dealer Agreement ("the Agreement") since 1977. Several provisions in the Agreement are pertinent to this case. The Agreement assigns to the dealer a "Primary Market Area" ("PMA"), which is an area demarcated by census tracts surrounding the dealer. The PMA is a non-exclusive area, meaning that other Toyota dealers may sell into Coady's PMA and vice-versa. The Agreement requires Toyota to explain its vehicle distribution methods to dealers, to use its best efforts to provide dealers with enough Toyota products so that they can fulfill their obligations under the Agreement and to allocate Toyota products to dealers in a fair and equitable manner as determined by Toyota in its sole discretion. Toyota also recommends that its Regional Offices notify their dealers in writing at least 120 days prior to the expiration of the Agreement if any deficiencies need to be resolved before a renewal of the Agreement is consummated, although that recommendation is found in Toyota's Market Representation Policies and Procedures Manual and not the Agreement itself.

For most of Coady's tenure as a Toyota dealer, Coady has operated under a six-year Agreement, but its last six-year Agreement expired in February, 1999. At that time, Toyota offered Coady a two-year renewal Agreement. Contained within the 1999 Agreement was a new, non-standard provision requiring Coady to maintain at least a 100% retail sales efficiency for cars and trucks.[1] At that time,

---

1. "Retail sales efficiency" is a measurement that Toyota uses to determine a dealer's sales

performance by mathematically comparing

Coady's retail sales efficiency was just under 65%. When the 1999 Agreement expired sometime in 2001, Toyota again offered Coady a two-year agreement even though Coady's retail sales efficiency had dropped to below 40%. Contained within the 2001 Agreement were new, non-standard provisions requiring Coady to maintain a debt-to-equity ratio of no more than 1:1 and to renovate the interior of its facility to conform with so-called "Image USA" standards. The 2001 Agreement also retained the 1999 Agreement provision requiring Coady to maintain 100% retail sales efficiency. Coady did not sign the 2001 Agreement and has operated under month-to-month extensions since the expiration of the 1999 Agreement.

### B. Toyota's System for Motor Vehicle Allocation

Toyota distributes motor vehicles to dealers in the Region in a variety of ways, including periodic allocations, turndowns, the General Manager's Pool and the Market Representation Vehicle Support Program. A general rather than detailed description of each vehicle distribution method will suffice for purposes of this Memorandum and Order.

### 1. Periodic Allocations and the Balanced Day's Supply Method

Toyota allocates most vehicles to dealers through roughly bi-weekly allocations, usually at the beginning and in the middle of each month. Toyota relies on the Balanced Day's Supply Method ("BDSM"), a mathematical formula that allocates vehicles based upon each dealer's inventory and recent sales volume history and the quantity of vehicles that the Region has available to allocate at the time. Because the allocation formula is affected by remaining inventory, allocation pool vehicle

availability and recent sales volume history, a dealer does not earn one new vehicle for every vehicle it sells. Nevertheless, it is generally true that the more vehicles a dealer sells, the more likely it is to earn additional vehicles in a future allocation. As Toyota's witnesses repeated throughout the trial, "sales drive allocations."

When a dealer sells a vehicle, it inputs the sale information, including the vehicle identification number and the name, address and other information concerning the customer, into a computer system that informs Toyota of the sale. The BDSM depends upon accurate sales reporting by the dealers in the Region because those reports affect two of the three variables that determine the allocation of vehicles under that system: reported sales and current inventory. This is especially true at times of high demand for vehicles from the consuming public, which prevailed during much of the time period at issue in this case, because at such times dealers can sell vehicles like hot-cakes. Thus, inaccurately reported sales can dramatically affect the number and make of the vehicles allocated to dealers who inaccurately report *and* to dealers who accurately report. It is difficult to quantify, however, how many inaccurate reports are needed to affect the BDSM and even more difficult to determine the extent of that effect.

Dealers in the Region have not always reported sales accurately. In fact, dealers in the Region, including Expressway Motors, Bernardi and Boch, have submitted fraudulent sales reports in order to earn more vehicles under the BDSM, although the practice is not as rampant as Coady would have this Court believe. According to another dealer, Edward Darling, some dealers have engaged in that practice just prior to allocations in order to earn more

the dealer's total sales performance to Toyota's overall performance in the Region.

vehicles. Vehicles reported as sold as much as 60 days earlier were observed on satellite lots of the Bernardi and Boch dealerships. Although some sales that were later reversed as being inaccurately reported were the result of innocent mistakes or occurred just before periodic allocations because of legitimate dealership practices, a substantial number of those reversals, especially those involving popular makes and models, resulted from fraudulent sales reporting.

Toyota very likely knew that fraudulent sales reporting occurred in the Region. Kevin Coady and other dealers complained to Toyota that some dealers in the Region engaged in that practice. Also, Frank Fontanella, Toyota's National Vehicle Administration Manager, acknowledged that he knew inaccurate sales were intentionally reported, although he did not make that admission specifically with respect to the Region. There was no evidence that Toyota encouraged Region dealers to submit fraudulent sales reports or explained to them how they might manipulate the allocation system. Although Toyota apparently engaged in such practices in the late 1980s, there is no indication that it has done so since then.

The Court finds that, since about 1990, Toyota has encouraged Region dealers to submit accurate sales reports and has attempted to police reporting to ensure accuracy. The standard dealer agreement includes a provision requiring accurate sales reporting and Toyota gave periodic instruction to dealers in the Region on the importance of and how to make such reports. It also conducted ground stock au-

dits and "reversed" reported sales of vehicles still found on dealers' lots.

Furthermore, since 1998 Toyota's policy has been to decrease future allocations to dealers found to have significant rates of "no-matches." A "no-match" occurs when reported vehicle sales information does not match the registration of that vehicle at the appropriate motor vehicle registry.[2] Toyota has also recently decreased the bonuses of District Managers when the no-match rates in their districts are high.

Those efforts have not, however, resulted in a flawless allocation system because dealers still submit inaccurate sales reports. Indeed, simply reversing an inaccurately reported sale does not "self-correct" the BDSM because the reversal does not redistribute vehicles among the 71 Region dealers as they would have been distributed had the inaccurate sales report not been submitted. Furthermore, in the meantime, the falsely reported sale favorably affects the formula by which vehicles are allocated to the false reporter in the future and that advantage is not undone by the ultimate reversal.

### 2. Turndowns

Just because a dealer earns a vehicle in a periodic allocation does not mean that it must accept that vehicle from Toyota. For a variety of business reasons, dealers in the Region, including Coady, do not always accept every vehicle they earn in a periodic allocation. An earned vehicle that has been rejected by a dealer is a "turndown." When another dealer accepts that turndown, the vehicle is called a "reassigned turndown".

---

**2.** In its effort to prove fraudulent sales reporting, Coady relies heavily on its expert's opinion that no-matches with clear discrepancies between the reported customer name and address and the registered owner's name and address are "most likely" fraudulent sales but

Coady provides no analysis or foundation for that claim. While some no-matches undoubtedly resulted from fraudulent sales reports, this Court does not accept Coady's sweeping claims (barren of analysis) that all or most were caused by such reporting.

Each region develops its own method of reassigning turndowns. The Region presently redistributes turndowns by first offering them to dealers in the district to which they were originally assigned, and then, if any remain unclaimed, to other dealers in the Region. This method of distributing turndowns is similar to methods used in most other Toyota regions across the nation and is employed because it allows for rapid, low-cost distribution of turndowns based on an individualized assessment of each dealer's needs. It is deemed more efficient to distribute turndowns in this manner rather than to group all Region-wide turndowns together and distribute them through a second BDSM allocation as was done between 1989 and 1991.

There is no written policy, guideline or procedure to instruct district sales managers with respect to distributing turndowns. Thus, the turndown allocation system depends, to some extent, upon each district manager's discretion in offering vehicles to the dealers. That discretion was abused with respect to Coady on one or more occasions. Toyota's district managers in the Region occasionally offered desirable turndowns to dealers on the condition that they accept less desirable turndowns (a practice known as "packaging" or "bundling") but Toyota has not engaged in that practice with Coady since at least 1998.

When vehicles are rejected in both the periodic allocation and the turndown process, they fall into the Region's "port stock." Port stock vehicles are available to all dealers in the Region. Toyota notifies dealers of the vehicles it has in port stock via facsimile and dealers may claim those vehicles on a "first come, first served" basis. For a significant period of time, Coady was on the bottom of the facsimile list.

Ultimately, Coady's district (and Coady itself) had no fewer turndowns to choose from than did any other district in the mid-to-late 1990s. While the district in which Bernardi and Boch were located turned down more vehicles during those years, only in 1998 does it appear that no vehicles fell into port stock and in 1999 Coady had access to more turndowns than either of its major competitors. During those years, Coady also accepted more than its pro rata share of reassigned turndowns and an ample number of vehicles were available to all dealers as reassigned turndowns or port stock.

## 3. General Manager's Pool

Pursuant to Toyota's written policy, when the Region receives the vehicle allocation pool for a given period, the Region's General Manager has the authority to distribute up to 10% of the cars and 15% of the trucks throughout the Region at his discretion in order to help dealers meet specific inventory and customer needs. Vehicles distributed in this manner are referred to as "General Manager's Pool" ("GMP") vehicles and are distributed exclusive of those vehicles earned under the BDSM.

Before 1998, the percentage limitations included vehicles distributed to dealers through the Market Representation Vehicle Support Program ("MRVSP") described below. In that year, Toyota altered its policy to provide that General Managers may distribute GMP vehicles regardless of MRVSP allocations. Even before 1998, however, the Region did not always adhere to the percentage limits. General Manager William Faye repeatedly exceeded them because he thought the MRVSP vehicles were not counted as part of the GMP percentage limits, but, in any event, Coady received more than its pro rata share of GMP vehicles. On several

occasions, Kevin Coady verbally requested that Toyota inform the dealers how the GMP allocations were supposed to operate but Toyota refused to divulge that information.

### 4. Market Representation Vehicle Support Program

In addition to acquiring vehicles through periodic allocations, turndowns and the GMP, a dealer can also earn vehicles by becoming an "exclusive" Toyota dealership or by making qualifying investments in new or modernized facility construction. Specifically, dealers can earn vehicles through a program that awards vehicles to dealers who install qualifying branding signs and other improvements. As previously referred to, the program is called the "Market Representation Vehicle Support Program" ("MRVSP") and to qualify for it dealers must document their expenditures.

Toyota did not award Coady 30 vehicles in 1994 after Coady expended over $200,000 on qualified improvements to its facility because Coady failed to provide Toyota with the requisite documentation although it was invited in writing to apply. Bernardi, on the other hand, received more than 900 vehicles through the MRVSP in 1997 and 1998 for new facility construction.

### C. Coady's Relationship with Toyota

On a personal level, Kevin Coady has had a stormy relationship with Toyota's Regional personnel. Sometime in 1994, after Toyota refused to allow Coady to participate in a so-called "tent sale" near his dealership, he informed municipal authorities that Toyota was planning to operate such a sale in their town without a license. That effectively prevented the sale and "bad blood" has persisted between Coady and some Regional Managers ever since.

Toyota refused to deliver a vehicle to a Coady customer through that dealership and, instead, delivered the vehicle via another dealer in the Region. Ronald Nottingham, a Toyota parts distributor, dissuaded a potential Coady customer from buying a vehicle from Coady until directly confronted by Kevin Coady and, in late 1994 or 1995, Laura Kramer, Toyota's Parts Manager for Coady's district, told Coady representatives that Toyota would sanction fraudulent warranty approvals for Coady if it would sign up for a particular Toyota parts program. When Coady refused, Kramer told Coady representatives that Toyota would withhold future warranty work from that dealership.

Hostile personal relationships have persisted between Coady employees and personnel of the Region to the present time. As recently as November, 2002, Toyota told Coady that it would ship an unordered and unwanted toolbox to Coady and withdraw the $5,000 cost for the toolbox from Coady's account.

## II. Conclusions of Law

### A. Violation of the Automobile Dealers' Day in Court Act ("ADDCA"), 15 U.S.C. § 1221 *et seq.*

Section 1222 of the ADDCA allows an automobile dealer to sue an automobile manufacturer to recover damages sustained

> by reason of the failure of said automobile manufacturer ... to act in good faith in performing or complying with any of the terms or provisions of the franchise ... with said dealer ....

15 U.S.C. § 1222. The ADDCA defines "good faith" as

> the duty of each party to any franchise, and all officers, employees, or agents thereof to act in a fair and equitable manner toward each other so as to guar-

antee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party: *Provided,* That recommendation, endorsement, exposition, persuasion, urging or argument shall not be deemed to constitute a lack of good faith.

15 U.S.C. § 1221(e).

The First Circuit Court of Appeals has restricted bad faith under the ADDCA to actual coercion or intimidation. *H.D. Corp. of Puerto Rico v. Ford Motor Co.,* 791 F.2d 987, 990 (1st Cir.1986); *Wallace Motor Sales v. Amer. Motor Sales Corp.,* 780 F.2d 1049, 1056 (1st Cir.1985). Specifically, the alleged coercion or intimidation "must include a wrongful demand that would result in penalties or sanctions if not complied with," and it is not sufficient that a dealer may have felt it had been coerced and intimidated. *Wallace,* 780 F.2d at 1056. To show that Toyota failed to act in good faith, therefore, Coady must prove that Toyota's "conduct amounted to coercion and that as the result of intimidation or threats, it was forced to act or refrain from acting and that it suffered damage." *Id.*

The parties stipulated that, as defined by the ADDCA, Coady is a motor vehicle dealer, Toyota is a distributor and their relationship is governed by a dealer agreement. The only question of law with respect to Coady's ADDCA claim, therefore, is whether Toyota failed to act in good faith when dealing with Coady under their dealer agreement.

■ Coady failed to present sufficient evidence at trial to sustain its claim that Toyota failed to act in good faith in violation of the ADDCA. Coady's claims of intimidation and coercion against it by Toyota are based on two grounds.[3] The first ground arises from Laura Kramer's attempt to persuade Coady to sign up for the Toyota parts program. Kramer's threats, however, did not cause Coady to sign up for that program or to take or refrain from taking any other action. Coady, therefore, suffered no damages as a result of Kramer's threats and may not recover with respect to its ADDCA claim against Toyota on the basis of the interaction between Kramer and representatives of Coady.

■ The second ground for Coady's claim that Toyota violated the ADDCA arises from Toyota's "packaging" practices.[4] Although "packaging" has occurred in the Boston Region in the past, there was no proof that Toyota ever coerced Coady into accepting less desirable vehicles in order to obtain more desirable vehicles. Moreover, Coady offered no evidence of damages arising from the claim and, therefore, may not recover with respect to its ADDCA claim against Toyota on the ground of Toyota's "packaging" practices.

## B. Dealer's Bill of Rights, M.G.L. c. 93B

The bulk of Coady's claims against Toyota arise under M.G.L. c. 93B, the so-

---

**3.** In it's amended complaint, Coady alleges that Toyota violated the ADDCA by participating in a conspiracy with the Bernardi Toyota dealership, Coady's closest competitor, to terminate Coady's franchise but Coady presented no evidence of that alleged conspiracy at trial and, furthermore, seems to have abandoned the claim by failing to address it in its final submission to the Court.

**4.** So-called "packaging" practices were not specifically alleged in either of Coady's complaints with respect to the ADDCA but the Court permitted the introduction of such evidence at trial.

called "Dealer's Bill of Rights."[5] *Gallo Motor Center Corp. v. Mazda Motor of Amer., Inc.*, 204 F.Supp.2d 144, 145 (D.Mass.2002). Enacted as a supplement to the ADDCA, *see Tober Foreign Motors, Inc. v. Reiter Oldsmobile, Inc.*, 376 Mass. 313, 319–20, 381 N.E.2d 908, 912 (1978), and "in recognition of the potentially oppressive power of automobile manufacturers and distributors in relation to their affiliated dealers," Chapter 93B regulates, in part, the relationship between dealers and distributors. *Amer. Honda Motor Co., Inc. v. Bernardi's, Inc.*, 432 Mass. 425, 432, 735 N.E.2d 348, 354 (2000) (internal quotation marks omitted). To level the playing field among the players, Chapter 93B declares unlawful "unfair methods of competition and unfair or deceptive acts or practices." M.G.L. c. 93B, § 3(a). Section 4 of Chapter 93B explicitly, although not always helpfully, defines actions that fall within the prohibition of § 3(a). *See Motorsport Eng'g, Inc. v. Maserati SPA*, 316 F.3d 26, 30 (2002) (noting Chapter 93B's vague bans on "arbitrary" and "bad faith" actions).

Coady alleges that Toyota, by various acts with respect to which it presented evidence at trial, violated six different provisions of § 4.[6] The Court will address the alleged violations of the Dealer's Bill of Rights, *seriatim.*

### 1. Coercion

Chapter 93B forbids a distributor to coerce, or to attempt to coerce, a dealer to accept, buy or order any motor vehicle or vehicles, appliances, equipment, parts

or accessories, or any other commodity or commodities or service or services which has not or have not been ordered or requested by such motor vehicle dealer; or, to require a motor vehicle dealer to accept, buy, order or purchase a motor vehicle or motor vehicles, appliances, equipment, optional parts or accessories, or any commodity or commodities or service or services or anything of value whether supplied or rendered by the [distributor], in order to obtain any motor vehicle or vehicles or any other commodity or commodities which has been ordered or requested by such motor vehicle dealer.

M.G.L. c. 93B, § 4(2)(a). Although not specifically alleged in either of Coady's complaints, the Court allowed Coady, at trial, to introduce evidence supporting claims under § 4(2)(a). Coady alleges that the following three separate acts by Toyota violate that provision:

a. Just last November, Toyota told Coady that it would ship a toolbox, which Coady had not ordered and did not want, to Coady and deduct the $5,000 cost for the toolbox from Coady's account. Coady, however, failed to allege or offer any evidence with respect to damages for the violation, if there was one, of Chapter 93B. Coady also seems to have abandoned the claim, because it did not address the claim in its most recent submission to the Court. Toyota, therefore, is not liable to Coady under Chapter 93B for informing Coady that it would ship the tool box and charge Coady's account for it.

---

**5.** The Great and General Court of the Commonwealth of Massachusetts recodified Chapter 93B, effective September 1, 2002. *See* 2002 Mass. Acts 222, §§ 3, 7. The parties and the Court agree, however, that the prior version of Chapter 93B governs this dispute. *See id.* § 5.

**6.** Although Coady alleged in both of its complaints that Toyota violated a seventh provision in § 4, specifically, § 4(3)(c), which governs the delivery of advertised vehicles, it abandoned reliance on that provision at trial and in its most recent submission to the Court.

■ b. Coady alleges that in 1994 Toyota violated Chapter 93B when Laura Kramer attempted to coerce Coady's participation in a Toyota parts program by offering to approve fraudulent warranty claims in return for such participation and then threatening to withhold legitimate warranty work from Coady when it refused. Assuming that Kramer, by her actions, attempted to force Coady to "accept, buy or order any ... service or services" that it had not ordered or requested, Coady failed to allege or offer any evidence with respect to damages arising from that incident. Moreover, specifically with reference to that incident, this Court will not enjoin such practice because it happened, if at all, nearly eight years ago and there is no evidence that it continues today. Toyota is not, therefore, liable to Coady under Chapter 93B for Kramer's actions. .

■ c. Seeking only injunctive relief, Coady alleges that Toyota violated Chapter 93B, § 4(2)(a) to the extent that Toyota engaged in the practice of "packaging" vehicles.[7] Even if Coady was, at one time, coerced into accepting "packages" (as to which this Court makes no finding), it has not been so coerced since at least 1998. Also, neither of the two District Managers who allegedly forced Coady to accept packages remain in that position. Because there is no evidence that the practice continues, there is no actionable conduct to "have the effect of causing" Coady a pecuniary or property loss which is a prerequisite for obtaining equitable relief for a violation of Chapter 93B. *See* M.G.L. c. 93B, § 12A. Coady is not, therefore, entitled to equitable relief under Chapter 93B against Toyota for packaging.

## 2. Motor Vehicle Allocation

Chapter 93B makes it illegal for a distributor to

adopt, change, establish or implement a plan or system for the allocation and distribution of new motor vehicles to motor vehicle dealers which is *arbitrary or unfair* or to modify an existing plan so as to cause the same to be *arbitrary or unfair.*

M.G.L. c. 93B, § 4(3)(a) (emphases added). Coady alleges that Toyota "arbitrarily or unfairly" distributed vehicles to it through periodic allocations, turndowns, the General Manager's Pool and the Market Representation Vehicle Support Program.

Unfortunately, the Massachusetts legislature did not define what is "arbitrary or unfair" for purposes of § 4(3)(a). Nor has the phrase been interpreted by Massachusetts case law.[8] This Court must, therefore, resort to traditional principles of statutory interpretation to determine what conduct is prohibited by § 4(3)(a). The Supreme Judicial Court has clearly outlined the procedure to follow:

When interpreting [Chapter 93B], we are to construe the words therein according to their natural import in common and approved usage. While courts should look to dictionary definitions and accepted meanings in other legal contexts, their interpretations must remain faithful to the purpose and construction of the statute as a whole.

*Bernardi's*, 432 Mass. at 430, 735 N.E.2d at 352 (citations and internal quotation marks and ellipsis omitted). Thus, the

---

7. In light of this Court's conclusion with respect to this claim, Toyota's objection to any consideration thereof on the grounds that it was not alleged in either of Coady's complaints is moot.

8. Indeed, Coady acknowledged that it was unable to locate any reported cases concerning challenges to unfair or arbitrary vehicle allocations under Chapter 93B or under similar statutes nationwide.

Court should first determine the plain meaning of the phrase "arbitrary or unfair" and then consider the purpose and statute as a whole with respect to vehicle allocation because the plain meaning may be considered only to the extent that it is consistent with that purpose.

■ The word "arbitrary" means "arising from unrestrained exercise of the will, caprice, or personal preference" or "based on random or convenient selection or choice rather than on reason or nature." Webster's Third New Int'l Dictionary 110 (1993); *see also* Black's Law Dictionary 100 (7th ed.1999) (providing similar definition). This district court, interpreting a New Hampshire statute modeled after and similar in purpose and scope to Chapter 93B, defined arbitrary as follows:

> The term "arbitrary" may be defined as being synonymous with bad faith or failure to exercise honest judgment. *Black's Law Dictionary* 96 (5th ed.1979). And "bad faith", the opposite of "good faith", may be defined to imply the conscious doing of a wrong because of a dishonest purpose. *Id.* at 127.

*New Hampshire Auto. Dealers Ass'n v. General Motors Corp.*, 620 F.Supp. 1150, 1157 n. 20 (D.Mass.1985); *see also Schott Motorcycle Supply v. Amer. Honda Motor Co., Inc.*, 976 F.2d 58, 63 (1st Cir.1992) (defining "arbitrary" as "selected at random and without reason" for purposes of interpreting Maine statute). For purposes of § 4(3)(a), therefore, the term "arbitrary" connotes a plan or system for the allocation and distribution of new motor vehicles to motor vehicle dealers that is *not* based in reason and is implemented in bad faith because of a dishonest purpose.

■ The word "unfair" means "marked by injustice, partiality, or deception" or "providing an insufficient or inequitable basis for judgment or evaluation; not representative." Webster's Third New Int'l Dictionary 2494 (1993). In an analogous and closely related legal context under Massachusetts law, where "unfair methods of competition and unfair or deceptive acts or practices" in arms-length transactions between experienced, worldly-wise businessmen are forbidden (M.G.L. c. 93A, §§ 2(a) and 11; *see also Greenery Rehabilitation Group v. Antaramian*, 36 Mass. App.Ct. 73, 78–79, 628 N.E.2d 1291, 1295 (1994)), actions are not "unfair" until they "attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce." *Levings v. Forbes & Wallace, Inc.*, 8 Mass.App.Ct. 498, 504, 396 N.E.2d 149, 153 (1979). For purposes of § 4(3)(a), therefore, the term "unfair" connotes a plan or system for the allocation and distribution of new motor vehicles to motor vehicle dealers that is based on inequity, dishonesty and fraud.

Before applying the plain meaning definitions of "arbitrary" and "unfair" to the allocation system implemented by Toyota, it is necessary to ensure that they are "faithful to [both] the purpose and construction of the statute as a whole." *Bernardi's*, 432 Mass. at 430, 735 N.E.2d at 352. As noted before, Chapter 93B "was enacted in recognition of the potentially oppressive power of automobile manufacturers and distributors in relation to their affiliated dealers." *Bernardi's*, 432 Mass. at 432, 735 N.E.2d at 354 (internal quotation marks omitted). The Supreme Judicial Court ("the SJC") has also announced that Chapter 93B was

> designed to protect franchisees from having to succumb to dictation by manufacturers pressing their *own interests* in disregard of the health of other elements in the trade and perhaps ultimately of the welfare of the public.

*Tober*, 376 Mass. at 322, 381 N.E.2d at 913 (emphasis added).

This Court need not, however, consider the purpose of Chapter 93B in the abstract. The SJC has specifically and authoritatively addressed the purpose of Chapter 93B with respect to the allocation of vehicles to dealers and this Court must be guided by that ultimate arbiter of state law. In *Tober*, the SJC recognized that Chapter 93B responded to "long-recognized problems including that of the coercion of dealers by automobile manufacturers through such means as the cutting off or purposeful manipulation of the supply of cars." *Tober*, 376 Mass. at 319, 381 N.E.2d at 912; *see also Deere & Co. v. Ford*, 434 Mass. 223, 231, 747 N.E.2d 1208, 1214 (2001); *Beard Motors, Inc. v. Toyota Motor Distributors, Inc.*, 395 Mass. 428, 432, 480 N.E.2d 303, 306 (1985).

Any plain meaning definition of "arbitrary or unfair" must, therefore, limit liability on the part of a distributor to damages that arise from its coercion of the dealer by cutting off or purposefully manipulating the supply of vehicles. *But cf. General GMC, Inc. v. Volvo White Truck Corp.*, 918 F.2d 306, 309 (1st Cir.1990) (suggesting that Chapter 93B may, unlike the ADDCA, prohibit more than just coercion or intimidation with respect to prohibitions of actions taken in "bad faith" because Chapter 93B, unlike the ADDCA, does not define "bad faith").

The plain meaning definition of "arbitrary or unfair," in addition to being informed by the purpose of Chapter 93B with respect to the allocation of vehicles, also depends upon the construction of Chapter 93B as a whole. To that end, consideration of how those terms are used throughout Chapter 93B may be helpful.

The term "arbitrary" is used in several other sections of Chapter 93B besides § 4(3)(a). *See* M.G.L. c. 93B, §§ 4(1), 4(3)(e), 4(3)(1). In one instance the statute confirms that what is "arbitrary" must be considered in the light of "all pertinent circumstances" and includes a non-exhaustive list of eight such circumstances. *Id.* § 4(3)(1); *see also Richard Lundgren, Inc. v. Amer. Honda Motor Co.*, 45 Mass.App. Ct. 410, 412, 699 N.E.2d 11, 13 (1998) ("In its c. 93B sense ... 'arbitrary' is a term of art that connotes that a new dealership will impinge economically on an existing dealership."). In connection with that provision, this Court has previously held that "[c]ommon sense, experience and expert opinion may properly serve as guideposts in this Court's arbitrariness analysis" under § 4(3)(1). *Gallo*, 204 F.Supp.2d at 151.

The term "unfair" is actually a pivotal term in Chapter 93B, because it is "[u]nfair methods of competition and *unfair* or deceptive acts or practices" that the statute declares unlawful. M.G.L. c. 93B, § 3(a) (emphasis added). It is the several provisions of § 4 that are intended to define what is "unfair" for purposes of § 3(a), and § 4(3)(a) is redundant when it declares that "unfair" plans or systems for the allocation and distribution of new motor vehicles to motor vehicle dealers violates § 3, which already prohibits "unfair methods of competition and unfair or deceptive acts or practices." Similarly, the definition of "unfair" for purposes of § 4(3)(a) is not clarified by the use of the same term in § 3(a) because the latter defines "unfair" by reference to all of § 4. The redundant and ambiguous use of the term "unfair" leads this Court to conclude that its partner "arbitrary" may be more amenable to precise definition and, therefore, more helpful for our statutory interpretation of § 4(3)(a).

With these principles of law in mind, this Court turns to the task of applying them to the facts as found above to determine whether Toyota implemented an "ar-

bitrary or unfair" system of vehicle allocation.

### a. Periodic Allocations

In the absence of any claim that Toyota itself "cut off" Coady's supply of vehicles, in order to show that Toyota has implemented an "arbitrary or unfair" allocation system for the distribution of motor vehicles to Coady through periodic allocations, Coady must prove, based on "all pertinent circumstances," that Toyota affirmatively facilitated or encouraged fraudulent sales reporting by dealers other than Coady. It is insufficient for Coady to prove that dealers other than Coady inaccurately reported sales because, to be "arbitrary or unfair," such inaccurate sales reporting must be shown to be fraudulent or dishonest. Nor is it sufficient to prove that Toyota knew about fraudulent sales reporting by its dealers but failed to prevent it.

The purpose of Chapter 93B with respect to the allocation of vehicles, which is to prevent distributors from coercing dealers by cutting off or purposefully manipulating the supply of vehicles, requires Coady to prove that Toyota affirmatively facilitated or encouraged fraudulent sales reporting in order to establish liability under § 4(3)(a). *See Tober*, 376 Mass. at 319, 381 N.E.2d at 912. Mere knowledge of and failure to prevent such reporting under most, if not all, circumstances does not amount to coercion of dealers through purposeful manipulation.

To the contrary, Coady argues that mere knowledge of and failure to prevent inaccurate sales reporting, fraudulent or innocent, amounts to the implementation of an "arbitrary or unfair" system of vehicle allocation in violation of Chapter 93B. As noted above, however, Coady is unable to point to any authority for that proposition. Coady relies extensively on *Harvey Investments, Inc. v. Toyota Motor Sales,*

*U.S.A., Inc.,* 1998 WL 767080 (6th Cir. 1998), where a dealer sued Toyota for (presumably) "arbitrary or capricious" vehicle allocations in violation of Michigan's counterpart to Chapter 93B, Mich. Comp. Laws § 445.1574, but such reliance to establish the *prima facie* case for a § 4(3)(a) violation and to show that Toyota committed such a violation is misplaced.

Fundamentally, *Harvey* applied Michigan (not Massachusetts) law and the pertinent provisions of Chapter 93B simply were not at issue. Furthermore, even if Michigan's prohibition of "arbitrary or capricious" allocation systems is analogous to, and instructive with respect to an interpretation of, Chapter 93B, the *Harvey* opinion is inapposite for the following reasons:

1) *Harvey* did not address the issue of liability. Rather, the Sixth Circuit upheld the district court's entry of summary judgment against the dealer for failure to show that Toyota caused whatever damages the dealer suffered, if any. While both the trial and the appellate courts in *Harvey* noted that Toyota likely knew about, and may have even encouraged, inaccurate sales reporting, neither court indicated whether that was a violation of Michigan law. Nor could such a finding have been made because to have done so would have been to disregard what the district court found were genuine issues of material fact. Furthermore, Toyota's denial of knowledge of fraudulent sales reporting in Michigan coupled with the district court's procedural disability to find otherwise contradicts Coady's claim that, because of *Harvey*, Toyota knew that dealers in the Region submitted fraudulent sales reports. If Toyota knew that such reporting was occurring in the Region, it is not because *Harvey* (which concerned dealers in Toyota's Cincinnati Region) put them on notice.

2) Even if the district court's recitation of the facts in *Harvey* constitutes a finding of liability on the part of Toyota, it is unclear that such liability pertained to the analogous Michigan law. The plaintiff in *Harvey* alleged violations of six different statutes, none of which were analyzed for purposes of liability by either *Harvey* Court.

3) Even if the *Harvey* decision reached the question of liability, it would not support Coady's contention that mere knowledge of and failure to prevent inaccurate sales reporting, fraudulent or innocent, amounts to the implementation of an "arbitrary or unfair" system of vehicle allocation. That is because the Sixth Circuit Court of Appeals apparently assumed, as this Court holds today, that a finding that Toyota "encouraged" fraudulent sales reporting is a prerequisite to establishing liability. *Harvey*, 1998 WL 767080, at *2.

The only remaining question with respect to Toyota's alleged liability for implementing an "arbitrary or unfair" system of vehicle allocations, therefore, is whether Toyota affirmatively facilitated or encouraged dealers other than Coady to submit fraudulent sales reports.

 This Court concludes that Toyota knew that fraudulent sales reporting took place in the Region but that knowledge is insufficient to establish Toyota's liability for implementing an "arbitrary or unfair" system of vehicle allocations. For such liability to attach, Coady was required to show that Toyota affirmatively facilitated or encouraged false sales reporting.

Although there was evidence that Toyota encouraged Region dealers to report sales fraudulently before 1991, there was no evidence that it had done so since that time.[9] As evidence of affirmative encouragement and facilitation, Coady argues that the BDSM does not "self-correct" when Toyota reverses a falsely reported sale by restoring that vehicle into the "selling" dealer's inventory weeks or months later. This Court agrees that such a reversal does not "self-correct" the BDSM but declines to conclude that Toyota's failure to recalculate vehicle allocations thereafter (if, indeed, it is possible to identify the fraudulent sale) amounts to the implementation of an "arbitrary or unfair" allocation of vehicles under § 4(3)(a).

Coady also argues that Toyota affirmatively facilitated and encouraged Toyota dealers to report fraudulent sales because Toyota neither took "adverse action" nor imposed any "penalties" against dealers who did so. Coady contends that Toyota should have reduced (but did not) the subsequent allocations of the fraudulently reporting dealer to account for the additional vehicles it might have been inappropriately assigned.

The failure to take such adverse action does not, however, affirmatively facilitate or encourage dealers to report sales fraudulently. Dealers may be able to manipulate the BDSM by virtue of such false reports, but it does not follow as a matter of course that Toyota itself is thereby manipulating the supply of vehicles to Coady. In the absence of evidence that Toyota actually encouraged dealers to submit

---

9. If Toyota encouraged dealers to submit fraudulent sales reports before 1991 (as to which this Court makes no finding), that would not prove liability in this case because such conduct occurred outside the damages period, i.e. before November 10, 1993, the beginning of the four-year statute of limitations period per M.G.L. c. 93B, § 14. *See*

*also Serra Chevrolet, Inc. v. Edwards Chevrolet, Inc.*, 850 So.2d 259, 2002 Ala. LEXIS 277 (Ala.2002) (upholding dismissal of claims for all damages sustained as a result of violations of Alabama's Motor Vehicle Franchise Act before the four-year statute of limitation accrued).

fraudulent sales reports or advised them how to manipulate the BDSM during the relevant damages period, Coady has failed to prove that Toyota's actions violated Chapter 93B. Section 4(3)(a) of that Chapter does not require Toyota to reduce the subsequent allocations of a dealer who fraudulently reports a sale.

Even assuming that a failure to penalize fraudulent sales reporting could, under some circumstances, amount to a violation of § 4(3)(a), Coady has not satisfied this Court that those circumstances are present in this case. Toyota took measures to prevent fraudulent sales reporting during the relevant damages period by encouraging dealers to report sales accurately and by policing the sales reporting practices of Region dealers.

The standard dealer agreement requires the dealer to report sales accurately and threatens termination of the franchise if it does not. While Toyota has never threatened the termination of a franchise for that reason, it has maintained a written policy throughout the relevant damages period that its dealers may not report sales fraudulently. From time to time, Toyota held meetings with dealers in the Region, one or more of which Kevin Coady attended, to encourage them to report accurately and to educate them on how to do so. In fact William Faye, General Manager for the Region for much of the time period relevant to this case, was strict about ensuring accurate sales reporting.

Furthermore, while Toyota may not have "penalized" dealers for reporting fraudulent sales, it did, during the relevant damages period, penalize its District Managers by decreasing their bonuses when their district's no-match rate was high. Also, during the same time frame, Toyota audited dealers' ground stocks to ensure that sales were reported accurately and reversed unsold vehicles back into the dealers' inventories. Finally, since 1998 it has been Toyota's policy to decrease a dealer's allocation of vehicles if their "no-matches" exceed 3% of total sales. Even before that nationwide policy went into effect, the Region itself attempted to monitor and reduce high rates of no-matches.

In summary, far from affirmatively facilitating or encouraging fraudulent sales reporting by dealers in the Region, Toyota took reasonable steps at all relevant times to ensure that sales were reported accurately and to reverse those sales that were not. Those steps, in turn, ensured that the Region's periodic allocations were neither arbitrary nor unfair. Toyota is not, therefore, liable to Coady for the manner in which it allocated vehicles under the BDSM.

**b. Turndowns**

Coady argues that Toyota's method of distributing turndowns is arbitrary and unfair for the following three reasons which the Court addresses *seriatim:*

1) The contention is made that there is no written policy governing how district managers distribute turndowns within their districts and thus they are free to deny individual dealers fair access to preferable turndowns. That discretion led, in one instance, to reduced turndowns during Andrew Brody's tenure as Coady's District Manager because Brody did not like Kevin Coady. The lack of a written policy is not, however, *per se* arbitrary and unfair because nothing in Chapter 93B requires distributors to have a written policy governing its allocation of vehicles. Rather, the statute merely requires that distributors allocate vehicles fairly and in a non-arbitrary manner. Nor is the freedom to distribute vehicles as District Managers see fit, by itself, a violation of Chapter 93B. To establish liability under Chapter 93B with respect to turndowns, Coady must show

that it was damaged because turndowns were actually distributed arbitrarily and unfairly and Coady has failed to do so.

■ Coady failed to offer any evidence of damages arising from the incident with Brody and this Court will not speculate as to how many turndowns were involved. Furthermore, there is no evidence as to what models and series were at issue or whether Coady would have accepted the vehicles had they been offered. Toyota, therefore, is not liable to Coady under Chapter 93B for Brody's failure to offer an unidentified number of turndowns to Coady on one occasion.

■ 2) Coady argues that Toyota's method of distributing turndowns by offering them first to the district in which the refusing dealer is located and then, if any remain, to the remainder of the Region, is an unfair and arbitrary system of allocation. Coady's concern is essentially geographic. Coady's Primary Market Area ("PMA") is contiguous with the PMAs of two of the Region's largest dealers, Bernardi and Boch, yet Coady is not in their district. Therefore, Bernardi and Boch have access to turndowns from other dealers in their district before Coady has access to them, even though Coady is located in that general vicinity. Toyota's decision to divide the Region into districts and then to offer turndowns as it does is not arbitrary or unfair under Chapter 93B.

Chapter 93B "does not purport to shield [dealers] entirely from adverse decisions formulated on legitimate business and economic grounds." *Foreign Motors, Inc. v. Audi of Amer., Inc.*, 755 F.Supp. 30, 35 (D.Mass.1991). Toyota has sound business reasons for allowing its District Managers to distribute turndowns in their discretion first to the district in which the declining dealer is located. Such a system allows for rapid, low-cost distribution of turndowns based on an individualized assessment of each dealer's needs and is more efficient than a reallocation of all turndowns across the Region. Indeed, the Region distributes its turndowns in a manner substantially similar to that used in other Toyota regions across the nation.[10]

In addition to failing to show that Toyota's method of distributing turndowns is arbitrary or unfair, Coady has failed to prove damages arising from Toyota's implementation of its method. To the contrary, Coady has accepted more than its pro rata share of reassigned turndowns from a large pool of turndowns throughout the late 1990s and has even declined to accept certain vehicles allocated to it.

Finally, it is worth noting that no dealer is "entitled" to turndowns in the same way that dealers are "entitled" to vehicles originally allocated under the BDSM. Indeed, if every dealer accepted every vehicle offered to it during the periodic allocation process under the BDSM, there would be no turndowns. Thus, in the absence of any evidence of an abuse of a District Manager's discretion under the system of assigning turndowns that caused damage to Coady, Toyota is not liable to Coady under Chapter 93B for choosing to distribute turndowns as it does.

3) Coady argues that Toyota's method of distributing "port stock" (i.e., vehicles left over after the turndown allocation process) by notifying the 71 dealers in the Region by facsimile of the vehicles available on a "first come, first served" basis, is an unfair and arbitrary system of alloca-

---

**10.** At the dealers' request, Toyota distributed turndowns through a second allocation across the Region for two years between 1989 and 1991 but that is not, as Coady argues, evidence that Toyota recognized the unfairness of its pre–1989 and post–1991 turndown distribution methods.

tion. The contention is that because Toyota notified Coady by facsimile rather than e-mail and because Coady is on the bottom of the facsimile list, Toyota's port stock distribution method is unfair. That argument is barely beyond frivolous and Toyota simply has not violated Chapter 93B by choosing, in the exercise of its business judgment, to use a facsimile machine instead of a computer.

In summary, Toyota's methods of distributing the Region's turndowns and port stock is not arbitrary or unfair in violation of Chapter 93B.

### c. General Manager's Pool

Coady argues that Toyota's distribution of vehicles through the General Manager's Pool (the "GMP") is arbitrary and unfair for the following two reasons, addressed sequentially:

■■■ 1) The Region distributed more vehicles through the GMP than Toyota's guidelines allowed. Until 1998, the monthly distribution of vehicles through the GMP could not exceed 10% of the cars and 15% of the trucks available for the periodic allocations that month. That limit included vehicles distributed under a special program known as the MRVSP. While the Region's General Manager, William Faye, continuously represented to the dealers that the limits were not exceeded from 1996 to 1998, they were, in fact, exceeded because Faye was under the mistaken impression that the MRVSP vehicles were not included in the GMP. Despite that mistake, the GMP allocation system was not arbitrary or unfair to Coady, and Toyota, therefore, is not liable to it for exceeding Toyota's self-imposed limits in the distribution of the GMP prior to 1998.

2) Coady contends that a) Toyota was arbitrary and unfair when, in 1998, it altered its national distribution policy with respect to the GMP and MRVSP vehicles to conform to the method that the Region used prior to 1998 and b) the new method, in effect, nullifies the periodic allocation under the BDSM because an unlimited number of vehicles can be assigned under the MRVSP method. Coady, however, relies on speculation and has presented no evidence of any such abuse. It cites the 900–plus vehicles allocated to Bernardi through the MRVSP as an example, but offers no evidence of how those vehicles adversely affected the contemporaneous allocation to Coady under the BDSM.

Moreover, Coady has failed to allege any damages arising from Toyota's allocation of vehicles through the GMP. To the contrary, Coady received more than its share of vehicles from the GMP from 1996 to 1998 during the time the General Manager was misapplying the rule. In summary, Coady has presented no evidence that Toyota's allocation of vehicles through the GMP was arbitrary or unfair or that Coady was damaged by Toyota's allocation of vehicles through the GMP.

### d. Market Representation Vehicle Support Program

■■■ Notwithstanding Coady's expenditure of $200,000 on qualifying improvements to its facility in 1994, Toyota's failure to provide 30 vehicles to it under the MRVSP did not constitute an arbitrary or unfair act. That is because Coady failed to provide Toyota with receipts to verify its construction expenditures which was a prerequisite under the program.[11] Coa-

11. Kevin Coady claims that Coady did not forward the expenditure documentation because a Toyota representative told him that, even if he did, Coady would not receive the anticipated vehicles. Had such a conversation actually occurred, however, the prudent dealer would have memorialized it in writing. Coady provided no such writing to this Court.

dy's claim of disparate treatment based upon the fact that Bernardi received over 900 vehicles under the same program after new facility construction fails because there no evidence that Bernardi did not meet the program requirements. Toyota, therefore, is not liable to Coady under Chapter 93B for its failure to provide Coady with 30 MRVSP vehicles in 1994.

### 3. Disclosure of Motor Vehicle Allocation Bases

Chapter 93B makes it illegal for a distributor to

fail or refuse to advise or disclose to any motor vehicle dealer having a franchise or selling agreement, upon written request therefore, the basis upon which new motor vehicles of the same line make are allocated or distributed to motor vehicle dealers in the commonwealth and the basis upon which the current allocation or distribution is being made or will be made to such motor vehicle dealer.

M.G.L. c. 93B, § 4(3)(b). Coady claims that Toyota violated that provision on a number of occasions by refusing to respond to Kevin Coady's requests about how the General Manager's Pool ("GMP") operates and the number of vehicles allocated through it. While Kevin Coady testified that the Dealer Council, which represents the concerns of the dealers to Toyota, made such a request in writing, Coady inexplicably failed to put any such writing into evidence. Indeed, the relevant evidence that was admitted focuses heavily, if not exclusively, on Kevin Coady's multiple verbal requests for the GMP information. Coady, therefore, has failed to prove that such requests were made in writing and, because § 4(3)(b) requires a writing, the provisions of § 4(3)(b) have not been violated.

Even if at least one request had been made in writing and had not been responded to by Toyota, Coady has nevertheless failed to allege any damages caused thereby or to request any other relief. Toyota is not, therefore, liable to Coady under Chapter 93B for failing to supply Coady with the requested GMP information.

### 4. Dealership Agreement Renewals

Chapter 93B makes it illegal for a distributor, notwithstanding any term or provision in the dealership agreement, to

offer a renewal, replacement or succeeding franchise or selling agreement containing terms and provisions the effect of which is to substantially change or modify the sales and service obligations or capital requirements of the motor vehicle dealer arbitrarily and without good cause and without giving [90–day written] notice [containing a detailed statement of the reasons for such action].

M.G.L. c. 93B, §§ 4(3)(e) & (e)(2). Coady alleges that Toyota violated that provision by substantially modifying its Agreement without good cause and without giving Coady the requisite 90–day notice.

#### a. 1999 Agreement

Toyota's renewal of the 1993 Agreement in 1999 allegedly violated § 4(3)(e) because it reduced the length of the Agreement from six years to two years and added a requirement that Coady achieve and maintain at least 100% sales efficiency for cars and trucks. To prove that those changes amount to a violation of § 4(3)(e), Coady must show 1) that they substantially amended or modified its sales and service obligations or capital requirements and 2) that the amendments were imposed "arbitrarily and without good cause" or without 90 days prior notice to Coady.

██ Toyota's decision to alter the length of the Agreement does not "substantially change or modify [Coady's] sales and service obligations or capital requirements." M.G.L. c. 93B, §§ 4(3)(e). The length of the Agreement has nothing to do with Coady's sales and service obligations or capital requirements, which presumably remain the same regardless of the length of the dealership agreement. Coady has failed to allege, much less prove, otherwise. Nor is a reduction in the term of the Agreement a failure "to extend" the agreement upon its expiration. *Id.* True, Chapter 93B makes it illegal for distributors to "fail or refuse to extend the franchise or selling agreement of a motor vehicle dealer upon its expiration without good cause" and appropriate notice, *id.*, but a mere alteration in the term of the Agreement is not a failure or refusal "to extend." Toyota was, therefore, entitled to renew the Agreement with Coady for a two-year term rather than a six-year term, for any cause and without notice.[12]

██ Toyota's decision to require Coady to achieve and maintain at least 100% sales efficiency for cars and trucks is a closer question. Nevertheless, assuming that 1) such a requirement was a substantial change or modification from Coady's sales and service obligations or capital requirements in its preceding Agreement and 2) the change was made without good cause or requisite notice, Coady has failed to allege any damages or entitlement to equitable relief arising from Toyota's decision to offer the 1999 renewal Agreement con-

taining those provisions. Indeed, Toyota offered to renew Coady's 1999 two-year Agreement in 2001, despite the fact that Coady's sales efficiency hovered between 35% and 40%, well below the standard "required" by the 1999 Agreement. Without a hint of how Coady proposes that this Court assess damages for such an alleged violation, it is unnecessary to consider whether Toyota actually violated § 4(3)(e).

### b. 2001 Agreement

Coady argues that Toyota's renewal of the 1999 Agreement in 2001 violated § 4(3)(e) because it added requirements that Coady maintain a debt to equity ratio of no more than 1:1 and renovate the interior of its facility to conform with the so-called "Image USA" standards.[13] To prove that such changes violated § 4(3)(e), Coady was required to show that they 1) substantially changed or modified Coady's sales and service obligations or capital requirements and 2) did so either "arbitrarily and without good cause" or without 90 days prior notice to Coady.

██ Even if the new requirements constituted substantial changes or modifications from Coady's sales and service obligations or capital requirements under its preceding Agreement and were made without good cause or requisite notice, Coady has failed to allege any damages arising from Toyota's offer of the 2001 Agreement renewal. Coady seeks, instead, to have this Court order Toyota to renew Coady's Agreement without the ad-

---

**12.** Coady argues that Toyota violated its own internal policies and procedures, which recommend "that the Region/Distributor notify the dealer in writing at least 120 days prior to expiration of his/her Agreement of any deficiencies which must be resolved before a Six-Year Agreement Renewal can be recommended," but by its plain language that is only a "recommendation" and neither entitles

Coady to 120 days written notice nor provides a basis for liability under § 4(3)(e) or contract law principles.

**13.** A third alleged violation of § 4(3)(e), that Coady meet certain car and truck sales efficiency standards, was included in the 1999 Agreement renewal and therefore does not constitute a change in the 2001 Agreement.

ditional provisions in the 2001 Agreement. The request is moot, however, because the only new provisions in the 2001 Agreement have been withdrawn by Toyota: the requirement that Coady renovate the interior of its facility to conform with Image USA standards (on May 15, 2001) and the requirement that Coady maintain a debt to equity ratio of no more than 1:1 (sometime in 2002). Coady is therefore entitled to no relief under § 4(3)(e).

### 5. Toyota's Direct Sales to Consumers

Chapter 93B makes it illegal for a distributor to

> own and operate, either directly or indirectly through any subsidiary, parent or affiliated company or firm, a motor vehicle dealership within the relevant market area of a motor vehicle dealer of the same line make . . . .

M.G.L. c. 93B, §§ 4(3)(k). Although not specifically alleged in either of Coady's complaints, the Court permitted Coady, at trial, to introduce evidence supporting claims under § 4(3)(k). Coady alleges that Toyota violated, and continues to violate, that provision by selling and leasing, through its regional office in Mansfield, Massachusetts, Toyota vehicles to its associates and their family members and to Toyota's vendors. Coady claims that the practice harms it by 1) decreasing the number of vehicles that Toyota has to allocate to the 71 Boston Region dealers and 2) decreasing Coady's sales efficiency when the vehicles sold are registered in its *primary* market area ("PMA").[14] Coady seeks to have this Court enjoin Toyota

from continuing to sell and lease vehicles in violation of M.G.L. c. 93B, § 4(3)(k).

■■■ Clearly, Toyota sells and leases vehicles out of its regional office, but Coady has failed to establish that Toyota has, thereby, violated the statutory provision at issue. First, Chapter 93B requires that the offending "motor vehicle dealership" (here, Toyota's regional office) be located within the challenging dealer's *"relevant market area"* as defined by the statute. *Id.* (emphasis added). Coady presented no evidence at trial with respect to whether Toyota's regional office in Mansfield, Massachusetts (approximately 15 miles from Coady's dealership) is within its "relevant market area." Given that the formula for determining the "relevant market area" of a dealer has been said to "perplex even the most percipient logician," *Bernardi's,* 432 Mass. at 428, 735 N.E.2d at 351, the absence of any such evidence is fatal to Coady's claim and this Court concludes that Coady has failed to prove that Toyota violated § 4(3)(k) by owning and operating a motor vehicle dealership of the same line make within Coady's "relevant market area."[15]

### 6. Arbitrary, in Bad Faith or Unconscionable Acts

As a catch-all provision, M.G.L. c. 93B, § 4(1) broadly declares that acts that are "arbitrary, in bad faith, or unconscionable" are "unfair or deceptive" in violation of § 3(a) of that statute. *Bernardi's,* 432 Mass. at 435, 735 N.E.2d at 355 ("[Section] 4(1) does not proscribe a particular act or practice, but rather is more general in scope."). Having declared that what is

---

**14.** "Primary market area" is a term defined by Toyota for internal accounting purposes and is not identical or even relevant to the statutory term "relevant market area" as it is used in Chapter 93B. *See id.*

**15.** Even if Coady had proved that Toyota's regional office is located within its "relevant market area," it nevertheless failed to prove that Toyota owns and operates a "motor vehicle dealership" as that term is defined by statute.

"arbitrary, in bad faith, or unconscionable" is "unfair or deceptive" is not, however, very enlightening.

Perhaps recognizing the difficulty in applying the catch-all provision to the facts of this case, Coady has abandoned reliance on § 4(1) in its final submission to this Court. For that reason, and because there is no evidence of unconscionable conduct or bad faith, this Court declines to address § 4(1) more specifically. *Cf. Bernardi's*, 432 Mass. at 427, 434–36, 735 N.E.2d at 350, 355–56 (holding that a motor vehicle dealer may not seek relief from a prospective, new dealership in its relevant market area under § 4(1) because it would nullify the more particular requirements of § 4(3)(1)); *Richard Lundgren*, 45 Mass.App.Ct. at 417, 699 N.E.2d at 15 (recognizing that it would be anomalous to find a violation under § 4(1) without a prior finding of a violation of § 4(3)(1)).

## C. Defamation

In Massachusetts, defamation is "the publication of material by one without a privilege to do so which ridicules or treats the plaintiff with contempt." *Correllas v. Viveiros*, 410 Mass. 314, 319, 572 N.E.2d 7, 10 (1991). The elements of a defamation claim, therefore, are "(1) a false and defamatory communication (2) of and concerning the plaintiff which is (3) published or shown to a third party." *See Dorn v. Astra USA*, 975 F.Supp. 388, 396 (D.Mass. 1997); *cf. McAvoy v. Shufrin*, 401 Mass. 593, 597, 518 N.E.2d 513, 517 (1988) ("The elements of a libel case are a false and defamatory written communication of and concerning the plaintiff."). A defamatory statement is one that holds the subject of the statement "up to disdain or disfavor in the community." *Eyal v. Helen Broad.*

*Corp.*, 411 Mass. 426, 433, 583 N.E.2d 228, 232 (1991).

With respect to damages for defamation where, as in this case, no specific harm is pled, "the plaintiff is limited to compensatory damages for actual injury, which include mental suffering and harm to reputation." *Stone v. Essex County Newspapers, Inc.*, 367 Mass. 849, 860, 330 N.E.2d 161, 169 (1975) (citations omitted). In order to prevail on its defamation claim and receive compensation in the form of actual damages, therefore, Coady is required, in the first instance, to prove that Toyota published ("showed" or "told") a false and defamatory communication of and concerning Coady to a third party.[16]

Coady attempted to prove defamation primarily through three incidents but the evidence as to each is insufficient:

1) Kevin Coady testified that in 1996 Robert Drach, Toyota's Assistant Regional Manager, told a potential Coady customer not to do business with Coady because it was not a reputable dealer but his subsequent testimony that the customer then purchased a new Toyota from another Boston Region Toyota dealer lacked foundation and his counsel did not cross-examine Drach concerning the alleged defamatory statement.

2) Without authorization, a representative of Toyota told a Coady customer that Coady no longer wished to deal with the customer and that Toyota would deliver the customer's vehicle through a different Boston Region dealer but there was no evidence that the statement, even if unethical, caused Coady any harm.

3) Ronald Nottingham, a parts distributor for Toyota, told a potential

---

**16.** Because, as determined herein, Coady has failed to satisfy the three primary elements for defamation, it is unnecessary to address the question of whether Coady is a "public figure" which, if found, would require further inquiry.

Coady customer to shop around and compare several Toyota dealerships after she expressed to him some concern about doing business with Coady but after Kevin Coady confronted Nottingham about that conversation, Nottingham wrote an apologetic note to the potential customer and there is no evidence of any adverse consequence to Coady thereafter.

Coady testified to several other incidents of Toyota's alleged defamation but none of that testimony proved defamation.

## D. Breach of Contract

■ In Massachusetts, a breach of contract is proven by a showing that (1) an agreement was made between the plaintiff and the defendant supported by valid consideration, (2) the plaintiff was ready, willing and able to perform, (3) the defendant failed to perform a material obligation under the agreement and (4) the plaintiff suffered damage as a result of defendant's failure to perform. *See Singarella v. City of Boston*, 342 Mass. 385, 387, 173 N.E.2d 290, 291 (1961). It is undisputed that a legally enforceable agreement existed between the parties in this case and Toyota does not contend that Coady was not ready, willing and able to perform that agreement. The only questions of law with respect to Coady's claim for breach of contract are, therefore, whether Toyota failed to perform a material obligation under the agreement and, if so, whether Coady suffered any damage as a result thereof.

Coady claims that Toyota breached its contract with Coady in three ways but has failed to present sufficient evidence to prove any of the alleged breaches:

■ 1) Coady claims that Toyota breached the Agreement by failing to provide Coady with an explanation of how it distributed new motor vehicles among Toyota dealers. Toyota's obligation to provide such an explanation arises from Section XIII, Paragraph B of the Dealer Agreement, which states, in relevant part, that "DISTRIBUTOR agrees to provide DEALER with an explanation of the method used to distribute [Toyota] products." Kevin Coady was familiar with the BDSM even if he did not at all times understand it completely, so at least some explanation about periodic allocations was provided. Toyota did not, however, provide Coady with an explanation of how it distributed GMP vehicles. Those vehicles were distributed in a discretionary manner by the General Manager of the Region and accounted for no more than 15% of the periodic allocation pool. The method of how those vehicles were (or are) allocated defies clear explanation but there is no evidence that it caused Coady any harm not to have precise information in that regard.

2) Coady claims that Toyota breached the Agreement by permitting Bernardi to purchase and sell motor vehicles from and to other Toyota dealerships in violation of Section XIV, Paragraph B of the Dealer Agreement. That provision provides:

> DEALER is authorized to sell Toyota Motor Vehicles only to customers located in the continental United States. DEALER agrees that it will not sell Toyota Motor Vehicles for resale or use outside the continental Untied States. DEALER agrees to abide by any export policy established by DISTRIBUTOR.

Coady seems to have abandoned this particular claim in its final submission to the Court but, in any event, it failed to present any evidence at trial a) that Toyota "permitted" Bernardi to purchase or sell motor vehicles from or to other Toyota dealerships, b) that, if such permission was granted, it violated Section XIV, Para-

graph B of the Dealer Agreement or c) that it harmed Coady.

3) Coady claims that Toyota breached the Agreement by failing to provide it with such quantities and types of motor vehicles necessary to fulfill its obligations with respect to the sale and servicing of Toyota products in violation of Section XIII, Paragraph B of the Dealer Agreement. That provision provides, in relevant part:

> DISTRIBUTOR agrees to use its best efforts to provide Toyota Products to DEALER in such quantities and types as may be required by DEALER to fulfill its obligations with respect to the sale and servicing of Toyota products under this Agreement, subject to available supply from IMPORTER, DISTRIBUTOR's requirements, and any change or discontinuance with respect to any Toyota Product. DISTRIBUTOR will endeavor to allocate Toyota Products among its dealers in a fair and equitable manner, which it shall determine in its sole discretion.

That provision does not guarantee that dealers will receive enough vehicles to fulfill their obligations under their dealership agreements. Rather, it assures the dealer that Toyota will "use its best efforts" to see that such vehicles are provided. Even if Coady were so entitled, the evidence is that Coady had the opportunity to obtain vehicles through turndowns, port stock and GMP vehicles in such quantity that, if it sold them promptly, it could have earned additional vehicles and could have increased its retail sales efficiency.

It is important to note that the agreement provides that availability is a key component to distribution, which must be allocated fairly and equitably in Toyota's sole discretion. That provision does not entitle Coady to whatever vehicles it wants. Coady may not, therefore, recover with respect to its breach of contract claim against Toyota.

## E. Causation and Damages

Although this Court has concluded that Toyota is not liable to Coady on any of its claims and that Coady has failed even to allege damages with respect to some of its claims, the Court deems it prudent to address Coady's alleged damages on the remainder of its claims because of the extent to which damages were at issue at trial.

### 1. Causation

Assuming Coady had proven liability with respect to some of all of its claims, it was faced with a major challenge of proving causation. Coady does not allege that Toyota, at any time, intended to manipulate or "cut off" Coady's supply of vehicles. Coady's damages, if any, are as a result of the manner in which other dealers in the Region report (or falsely report) the sales of their vehicles. While some dealers may attempt to manipulate the system in order to benefit themselves to the detriment of other dealers, Coady has not alleged or offered evidence that Toyota itself had such an intent. Coady's concerns are primarily with other dealers, such as Bernardi and Boch, yet even the harm caused by those dealers, if any, is not as extensive as Coady would have this Court believe.

With respect to Bernardi, Coady points to July 1995 as a pivotal date. That is when Norman Wagner, who seems to have engaged in dubious sales reporting practices wherever he worked, became employed by Bernardi. Coincidentally, that is also when Bernardi received an unusually large number of vehicles from the Region. Coady presented no evidence of where those vehicles came from but Kevin Coady is certain that they were the primary reason for Bernardi's increased sales

over the following years, which, in turn, caused Coady damages.

Based on the BDSM, it is doubtful that one allocation of vehicles could have had such a positive impact on one dealer and adverse impact on another. Nevertheless, Coady has utterly failed to demonstrate how such an allocation of additional vehicles damaged Coady in any way. It offered no evidence that the vehicles were wrongfully obtained by Bernardi. Coady's expert speculates that they were allocated to Bernardi as turndowns or port stock, which, if true, are legitimate means for a dealer in the Region to obtain vehicles. Thus, the fact that Bernardi obtained a large quantity of vehicles in 1995 cannot have caused Coady any legally compensable damages.

## 2. Damages

Although the Court need not address the issue of damages, it does so only briefly to point out the overly speculative nature of Coady's allegations on the subject. In order to prove its damages for lost profits, Coady was required to show that it would have been able to sell to the consuming public the vehicles to which it was purportedly entitled but did not receive. While Coady offered evidence of its past sales history and proved that it is adequately capitalized to handle a much larger volume of sales, it did not demonstrate that it could or would have sold those vehicles if it had received them. It is not simply a given that, because Coady is allocated a vehicle, it will sell that vehicle. This does not mean that Coady would have had to offer the testimony of potential buyers indicating that they were ready, willing and able to purchase the hypothetical vehicles. It does mean, however, that, for Coady to prove lost profits on the sales of vehicles wrongfully withheld by Toyota in violation of Chapter 93B, it would have

had to offer evidence of some formula, perhaps based on Coady's track record, to verify its capability of selling the vehicles that it claims were wrongfully withheld from it. Coady never presented any such evidence to this Court.

Also, in order to show damages for lost profits, Coady would have had to show that it did not participate in the misreporting that led to erroneous allocations of vehicles across the Region. While Coady's reversals, no-matches and fraudulent sales reports were not as bad as some other dealers in the Region, Coady cannot claim entirely clean hands. For example, Dr. Manuel's chart entitled "495 and Bernardi Reversals with Allocation Run Dates, 1996" (Ex. 265, Tab 9), which compares the timing of allocation runs and later-reversed sales for Bernardi and Coady, shows that, although Bernardi had substantially more reversed sales in 1996, Coady's reversed sales occurred, as did Bernardi's, at or near the time of the periodic allocations. Coady claims that such timing is evidence of fraudulent sales reporting, which, if true, would implicate a high percentage of its own reversals.

Finally, because Coady has not prevailed in its claims against Toyota, it is not entitled to an award of reasonable attorney's fees or costs pursuant to M.G.L. c. 93B, § 12A.

## III. *Conclusion*

Coady considers the location of its dealership to be unfortunate because it must compete with Bernardi, Boch and other large dealers. It has the Court's sympathy but what Coady fails to acknowledge is that close proximity to the high-volume Toyota dealers also means that it is in the highest volume market in the Boston Region. Almost by definition, within the higher volume markets are found the toughest competitors. Coady would have

the benefits of the former without the complexities of the latter and, to accomplish that end, seeks to have this Court adjust the rules for that competition. This Court will not do that because there is no legal justification for such action. Accordingly, judgment will enter for Toyota on all counts.

**So ordered.**